THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. STEVEN DALE HOFFSTETTER *et al.*, Defendants-Appellees.

Fifth District   No. 5—83—0534

Opinion filed November 2, 1984.

Don W. Weber, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

Ralph J. Mendelsohn, of Alton, for appellee Veronica Gale Piper.

Randy E. Blue and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellee Steven Dale Hoffstetter.

JUSTICE KARNS delivered the opinion of the court:

Defendants, Steven Dale Hoffstetter and Veronica Gale Piper, were charged by information in the circuit court of Madison County with possession of more than 500 grams of cannabis, a felony. (Ill. Rev. Stat. 1983, ch. 56½, par. 704(e).) Each defendant filed a motion to suppress evidence seized by Alton police pursuant to entry into the rear portion of a building leased by defendant Hoffstetter as a music store and also occupied by him in the rear portion as a residence. After a suppression hearing the trial court granted defendants' motions, and the State has appealed pursuant to Supreme Court Rule 604(a)(1). On appeal, the State maintains that the trial court erred in suppressing the evidence because the police officers had probable cause to enter the building and thereafter had probable cause to arrest both defendants because a crime was being committed in their presence.

On October 18, 1982, Alton police officer Brakeville, while on routine patrol at about 6 a.m., observed the front door of Twin Rivers Music Store standing open. This, he testified, he found unusual because the business was not normally open at that hour. He looked in and with the aid of his flashlight saw a man lying on the floor. He entered to investigate and determined immediately from the strong odor of alcohol that the man had simply passed out in a drunken state. He testified that the front room had no lights on but that he noticed a light emanating from the rear. He went back outside to radio for assistance and then returned to investigate further. Proceeding to the rear he heard voices of "at least two people." He testified that he also smelled what he considered to be a strong odor of burning marijuana. Brakeville also testified that he called out several times to announce his presence but that no one responded. He went back to the front door to wait for his backup because, he testified, "I was unaware of the complete situation back there. *** I didn't know whether they were armed or what the situation was."

Officer Cunningham arrived about three minutes later. Brakeville advised Cunningham of his previous observations. Both officers entered the store and the man on the floor was reexamined and found to be without need of assistance. Cunningham testified that he too smelled a strong odor of what he thought was marijuana smoke as they approached the rear portion of the building. Neither officer announced their presence at this time, nor were their guns drawn. Both officers testified that there were no closed doors opened by them. Brakeville testified that he sensed no immediate danger, and Cunningham testified that he had no reason to believe there was a burglar. Cunningham stated on cross-examination, "I just thought there was something unu-

sual taking place because normally these doors are locked \*\*\*." They proceeded through a doorway into the middle section of the building and then on through another doorway to the rear section of the building, where there was a separate partitioned area from where the voices emanated. Brakeville testified that the officers paused to listen to the voices. Upon finally reaching the doorway to this living area, Hoffstetter's residence, the officers observed both defendants sitting there in the room.

Brakeville testified that he observed nothing burning but did observe in plain view a clear bag of "green leafy substance" sitting on the table between the couches upon which defendants were sitting and about 10 feet from where he was standing. From the doorway he also observed a waterpipe smoking device. Cunningham testified that he observed a burning "reefer," a marijuana cigarette, being passed between defendants, although this was not mentioned in his official report nor was it included in the search inventory. Cunningham testified, and he too saw bags of "green leafy substance" in plain view which he considered to be marijuana. Hoffstetter noticed the officers at the doorway, whereupon they entered and placed both defendants under arrest. The officers then proceeded to conduct a thorough search of the living area. The officers seized 11 plastic bags, two paper sacks and one waterpipe smoking device, all of which contained "a green leafy substance," later positively identified as cannabis. The officers learned that the intoxicated man was a friend of Hoffstetter's.

Hoffstetter testified that the doors to the living area were closed, a "Keep Out" sign was posted outside the living area, the cannabis was contained in paper sacks under the table, and the waterpipe was hidden from view. He further testified that the door leading to the living area was shut. A light in the front room was on all night, he said. Piper testified that the door between the middle and rear rooms, where the sign was allegedly posted, was closed.

■■■ Warrantless searches and seizures are *per se* unreasonable under the fourth amendment unless they fall within a few specifically established and well-delineated exceptions: search by consent, search incident to arrest, and search predicated upon probable cause where there are exigent circumstances which make it impractical to obtain a warrant. (*People v. Gardner* (1984), 121 Ill. App. 3d 464, 459 N.E.2d 676, and cases therein cited.) The fourth amendment protection extends to commercial premises in which there is a reasonable expectation of privacy against governmental intrusion (*Marshall v. Barlow's, Inc.* (1978), 436 U.S. 307, 311, 56 L. Ed. 2d 305, 310, 98 S. Ct. 1816, 1819; *People v. Stamps* (1982), 108 Ill. App. 3d 280, 285, 438 N.E.2d

1282, 1289), but a warrantless entry of a commercial establishment may be permissible under the fourth amendment when a law enforcement officer discovers that commercial premises are unlocked and unattended at an hour when it would not be expected to be open for business. (*People v. Gardner* (1984), 121 Ill. App. 3d 464, 459 N.E.2d 676.) A warrantless intrusion into a commercial establishment under these circumstances must be very limited in nature. "[I]n certain *limited circumstances* law enforcement officials may enter an unsecured or unlocked commercial establishment during a nighttime security check *to secure the premises* and may take necessary measures to ascertain the identity of the proprietor. However, the courts will be vigilant to ensure that the rationale of protecting private property is not employed as a subterfuge to seek out evidence of criminal conduct. See 2 W. LaFave, Search & Seizure sec. 6.6(b), at 474-75 (1978)." (Emphasis added.) 121 Ill. App. 3d 464, 470, 459 N.E.2d 676, 680-81.

■ We agree with the trial court that Officer Brakeville's initial entry was lawful when at about 6 a.m., a time admittedly not within usual operating hours, he observed from his patrol car the door of the commercial establishment standing open. Under the reasoning of *Gardner*, Officer Brakeville could, without a search warrant, enter the building for the limited purpose "to secure the premises and *** take necessary measures to ascertain the identity of the proprietor." (*People v. Gardner* (1984), 121 Ill. App. 3d 464, 470, 459 N.E.2d 676, 680-81.) Upon entry into the premises in *Gardner*, the officer observed a vehicle which subsequent investigation determined was recently stolen, then obtained a search warrant and reentered the building. The discovery of the body in this case prompted, and we think justifiably so, a greater degree of suspicion and of immediate cause for prompt investigation than that present in either *Gardner* or the cases relied on therein. (See *People v. Gardner* (1984), 121 Ill. App. 3d 464, 459 N.E.2d 676; *State v. Myers* (Alaska 1979), 601 P.2d 239; *People v. Parra* (1973), 30 Cal. App. 3d 729, 106 Cal. Rptr. 531, *cert. denied* (1973), 414 U.S. 1116, 38 L. Ed. 2d 743, 94 S. Ct. 849.) We do not believe it is significant in determining the lawfulness of the warrantless entry that Brakeville left the building to radio for backup help and then returned, for the same situation confronted him upon his re-entry as upon his initial entry. Upon re-entry, Brakeville testified, "I went inside, checked the person laying on the floor *** at which time I walked towards the rear to make a preliminary check of the business *** to see if anybody else was inside, if there was any signs of a burglary or something, at which time I heard a couple voices at the rear and I turned around and exited the business and waited for Officer Cunning-

ham's arrival.'' It was at this time that he smelled what he thought was marijuana smoke. Brakeville further testified that he had never before been in that building and that he was not aware that the building contained a residence.

Our examination of this record leads us to conclude that, notwithstanding the lawful entry, this particular surreptitious intrusion into the living quarters was neither justified nor reasonable. Whatever exigency might have existed upon Brakeville's initial entry which would have allowed his continued intrusion to the rear of the building under the *Gardner* rationale, it no longer was present when both officers proceeded to the rear portion of the premises. The officers did not call out their presence in an effort to identify the persons in the back room, although the identity of the owner was known to the police, nor did they have revolvers drawn, although Brakeville testified that he did both of these things on his prior entry. Cunningham testified that had he believed there was a burglary in progress he would have taken his shotgun with him. In fact, when asked on cross-examination whether he was confident that there were no burglars, Cunningham replied, ''That's right.'' Further when asked, ''But you had no idea *** that [they] had committed any type of offense,'' he replied, ''At that time, no, sir.'' He added, ''I had an idea in my mind that there was some people in there that didn't belong there.'' The officers paused to listen to the voices before their presence was known. There was nothing in the front room or outside to give them any indication of foul play or criminal activity, except for the open door. There was, for example, no sign of forced entry, no broken glass, no overturned furniture and no suggestion of injury to the person on the floor. After determining that the man on the floor was only intoxicated, and securing the premises, any further investigation was prompted by curiosity. The officers thought that the owner resided at a different address, but they also knew that the business of the store was the rental of musical instruments to bands, which were often returned at late hours. No attempt was ever made to contact the owner at the place where Officer Cunningham thought he resided, nor was any attempt made to identify one of the voices as that of the owner by asking for identification, although Officer Cunningham knew Hoffstetter and referred to him by his first name.

By agreement of the parties, the trial court viewed the premises. He found the physical layout of the building as described in defendant's testimony and not as described by the police in their testimony. In short, he found the officers' testimony, which was inconsistent in several important respects, as we have noted, lacking in credibility.

We may not substitute our judgment for the trial court in weighing the testimony or determining which witnesses were more credible. (*People v. Creed* (1975), 34 Ill. App. 3d 282, 339 N.E.2d 305.) The trial court found that there was a reasonable expectation of privacy in the residential portion of the building, and it may have concluded that the officers knew or should have known that the rear portion of the premises was used as a residence. Warrantless intrusion into homes is permissible in only limited emergency circumstances. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) If in fact the officers detected the odor of burning cannabis, this fact alone would not justify a warrantless entry into a home or living quarters (*People v. Creed* (1975), 34 Ill. App. 3d 282, 339 N.E.2d 305), as it would not even justify an automobile search. (*People v. Wombacher* (1982), 104 Ill. App. 3d 812, 433 N.E.2d 374; *People v. Argenian* (1981), 97 Ill. App. 3d 592, 423 N.E.2d 289.) In any event, the odor of marijuana would only suggest to the officers the commission of a misdemeanor, which would not present the kind of exigent circumstances which would permit a warrantless intrusion into a person's home or living quarters. (*People v. Olson* (1983), 112 Ill. App. 3d 20, 444 N.E.2d 1147.) In fact, the officers had satisfied themselves that no crime was being committed. *Cf. People v. Eichelberger* (1982), 91 Ill. 2d 359, 438 N.E.2d 140.

The trial court found that the police proceeded to the rear of the store "guided only by the smell of smoke." The testimony of the officers was not only uncorroborated, considering the absence of physical evidence of burnt cannabis, but the officers, who were standing side-by-side at the doorway, testified to conflicting accounts regarding whether defendants were smoking marijuana.

■ A reviewing court will not disturb the trial court's finding on a motion to suppress unless that finding is determined to be manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766, 769.) Several material facts relevant to the existence of probable cause were in dispute. By agreement of the parties, the trial court viewed the premises. Its observations, when compared with the testimony of the police officers, undoubtedly affected the court's determination of credibility. For all of the foregoing reasons we believe the findings of the circuit court of Madison County are entitled to great weight and are not manifestly erroneous. The judgment of the circuit court of Madison County is affirmed.

Affirmed.

JONES and KASSERMAN, JJ., concur.