[Crim. No. 5530. Fourth Dist., Div. Two. Feb. 21, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS JOSEPH PARRA, Defendant and Appellant.

COUNSEL

Fred A. Lopez, Jr., and Jesse Arias, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Mark L. Christiansen and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUFMAN, J.**—Judgment of conviction was entered on a plea of guilty made by defendant Nicholas Joseph Parra to the charge of possession

of heroin for sale. (Health & Saf. Code, § 11500.5.) Defendant unsuccessfully moved the trial court to suppress certain evidence essential to establish his guilt. By this appeal, he seeks further review of the validity of the search and seizure. (Pen. Code, § 1538.5, subd. (m).)

At nightfall on Sunday evening, September 27, 1970, police officer Michael Robitzer arrived at a shopping center in Colton in response to a citizen's report that the front door of the Alpar Florist Shop was open. Although a sign on the door announced "Sorry, We Are Closed," Robitzer saw that the door was ajar. The door was made of glass, with a metal frame and push bar, and was hinged to swing both in and out. The lock on the door was of a kind that could be worked only by its key.

Robitzer checked the door and the front window for the name of the proprietor but found none. He then stepped inside the shop and with the aid of his flashlight looked around for the same information, without success. The city business license read only "Alpar Florist." A radio check with the police dispatcher also failed to produce from police records any name or telephone number of the party responsible for the business premises. Robitzer explained the reason for his investigation as follows: "Well, the fact that the door was left open and the building could be entered, the reason we have to have responsible person come down is to check to see if anything is missing, to see if a crime is committed and to secure his building and make sure everything was to his satisfaction before leaving."

Robitzer, a new man on the force, called the shift supervisor for assistance and shortly thereafter Sergeant Paul Connally appeared. The two reentered the shop. Connally explained the purpose for entering the premises as follows: "Our purpose would be to attempt to secure the store for the owner of the business as best we could, contact him and find out if anything, everything was all right, if anything had been taken, anything disturbed."

The officers passed through a partition to the rear portion of the shop. Connally found a light switch and turned on the lights. A kneehole-type desk was near the light switch. An examination of the clutter on the top of the desk yielded no information as to the proprietor of the shop. Connally said, "I thought that quite possibly there would be a business card in the desk and so I opened the large drawer in the center of the desk, the one right under the top of the desk." Upon opening the drawer six or eight inches, Connally saw three translucent prophylactic sheaths, one and one-half inch to two inches in diameter and three or four inches long, tied off at the ends and containing a powdery substance. Connally knew that narcotics are packaged in this way. His knowledge was derived from a

class in vice and narcotics control at California State College Los Angeles, departmental schools conducted by the narcotics division, and "training boards with narcotics paraphernalia and substances on them." He had made arrests for narcotics offenses and was familiar with how heroin was packaged for use on the streets.

Connally untied the end of the prophylactic and saw the "brownish powdery grainy substance" inside. He said that he "had a stronger suspicion at this time that it was, in fact, a narcotic," founded upon "previously seen narcotic heroin substance." Connally put in a call for the department's narcotics officers who subsequently arrived and confirmed that the substance was heroin.

Further search of the top desk drawer revealed more balloons and prophylactics, one of the latter containing "some type of substance inside."

The other drawers of the desk were opened. There and in other parts of the room more balloons and some teaspoons were found but no narcotics were found.

Defendant appeared at the shop about 10 p.m. Robitzer asked defendant if he was the owner of the shop and when defendant said, "Yes," he was placed under arrest. After being advised of his rights, defendant was asked whether the suspected heroin was his. Defendant admitted it was his, that it was heroin, that he got it from Mexico, and that he was dealing in narcotics and had been dealing "since March." When defendant was asked how much heroin there was he said, "Three balloons that are uncut, I cut three to one." Defendant said that he paid $2,500 for the heroin, and that he received a supply every month or month and a half from which he made $7,500.

Defendant consented to a search of his car in the trunk of which was found a balloon with "some type of substance inside."

The brown powder found in the desk and the automobile was chemically analyzed as 5.2 ounces of heroin.

■ The first question is whether it was lawful for the officers to enter the shop.

There is nothing in the record to suggest that the officers entered the retail business establishment for any purpose other than to provide for its security. To paraphrase section 197 of the Restatement Second of Torts, one is privileged to enter and remain on land in the possession of another if it reasonably appears to be necessary to prevent serious harm to the

land or chattels of the other party, unless the actor has reason to know that the one for whose benefit he enters is unwilling that he shall take such action. Section 197 is cited by the Supreme Court in *People* v. *Roberts,* 47 Cal.2d 374, 377 [303 P.2d 721], wherein the court recognizes the privilege of police officers to enter private premises to preserve life or property: "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose." According to the uncontradicted and credible evidence before the trial court, the officers entered the Alpar Florist Shop to protect the shop and its contents. Their presence in the shop was privileged.

Two recent Supreme Court cases relied on by defendant, *People* v. *Smith,* 7 Cal.3d 282 [101 Cal.Rptr. 893, 496 P.2d 1261], and *Horack* v. *Superior Court,* 3 Cal.3d 720 [91 Cal.Rptr. 569, 478 P.2d 1], are inapposite since both involved police intrusions into locked residential premises which were unlawful in their inception.

Concerning *Smith,* a police officer responded to a landlord's report that the tenant of an upstairs flat had left unsupervised a 6-year-old girl. The officer talked to the child, and then directed the landlord to unlock the door to the upstairs flat, ostensibly to ascertain whether the child's mother had returned home in the interim. The trial court had found the evidence insufficient to establish the existence of an imminent and substantial threat to life, health or property, and suppressed the evidence uncovered during the officer's entry. The Supreme Court could perceive no valid justification for reweighing the factual basis of this determination and affirmed the order of the trial court. (7 Cal.3d at pp. 286-287.)

As to *Horack,* police officers were conducting a noontime investigation of a report that two "hippie type" individuals had been seen entering what was believed to be a vacant residence. When there was no answer to the knock at the locked front door, the officers entered the house, guns drawn, through an unlocked rear door and proceeded to conduct a room-by-room and closet-by-closet search, which revealed a quantity of contraband. The People contended that the entry and search was authorized by the general duty of the police to investigate, detect and prevent crime and to protect life and property. The Supreme Court held, among other things, that, on the facts, emergency circumstances giving rise to an entrance under compulsion of necessity were simply not present. (3 Cal.3d at p. 725.)

The Supreme Court considered that in both *Smith* and *Horack* the belief upon which the officers acted was not the product of facts known

to or observed by them but of "a fanciful attempt to rationalize" a justification for warrantless entry. (*People* v. *Smith, supra,* 7 Cal.3d at p. 287.) In this case, unlike *Horack,* the officers were not engaged in tracking down criminals or evidence of crime, and unlike both *Horack* and *Smith,* the officers' reaction in entering the shop was not predicated upon abstractions or speculation but upon the observed fact of an unlocked door to a retail establishment after business hours, leading to the logical conclusion that the circumstance was a threat both to the private and public interests involved.

The next question is whether it was lawful for the officers to open the desk drawer.

According to the facts, the police were unable to solve the problem by merely locking the door and departing. The next move indicated by the circumstances was to communicate the difficulty to the proprietor who could himself then provide for the security of the shop and its contents. This move was frustrated by the absence of any identification of the proprietor displayed in the shop or recorded in the police department's index. At this point the officers were confronted with three alternatives: one, they could place a guard in the shop, at the expense of police service otherwise available to the community; or, two, they could leave the unlocked shop unguarded and resume patrol; or, three, they could continue efforts to identify and locate the proprietor. To avoid the dilemmas implicit in the first two alternatives, the officers elected the third alternative. Having exhausted the first obvious sources of information, they looked for identification of the proprietor in the next logical place, namely, the top drawer of the desk. The legal issue is whether this conduct offended the Fourth Amendment of the United States Constitution which commands that the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated.

The protection of the Constitution against unreasonable searches and seizures extends to business premises: there is no formula for the determination of reasonableness and each case must be decided on its own facts and circumstances. (*Go-Bart Importing Co.* v. *United States,* 282 U.S. 344 [75 L.Ed. 374, 51 S.Ct. 153].)

In a situation analogous to the within case, the Supreme Court has recognized that official reaction to exigent circumstances is equal to the emergency which attracted concern in the first place. (*People* v. *Lanthier,* 5 Cal.3d 751 [97 Cal.Rptr. 297, 488 P.2d 625].) In *Lanthier,* a supervisor of university maintenance and security received a complaint of a noxious odor emanating from somewhere in a study hall. Using a master key, he

opened each student locker in the hall until, in a locker used by the defendant, he found a briefcase from which the odor was emanating. The official opened the briefcase and saw, in transparent plastic wrapping, material which he suspected might be marijuana. The briefcase was turned over to university police who contacted the sheriff's department. A deputy sheriff identified the material as contraband.

At the preliminary examination, the magistrate found that the official was not looking for contraband or illicit or stolen property or any evidence of guilt of any crime or other offense; that the search was not unreasonable; and that it did not become unreasonable even when the official opened the briefcase. The Supreme Court agreed, holding that the People sustained the burden of showing justification for the warrantless search by a showing of facts bringing the search within the emergency exception, that is, that a compelling urgency was clearly shown making reasonable a prompt inspection of the premises. (5 Cal.3d at pp. 755-756.) The court also held that once the briefcase was discovered and opened, its contents were in plain sight, and that an observation from a lawful vantage point of contraband in plain sight is not a search in the constitutional sense.

 Here, as in *Lanthier,* the search was not undertaken to seek out evidence of crime. Two distinctions can be made between this case and *Lanthier.* In *Lanthier,* the inspection was conducted for the purpose of abating a nuisance. This case involved an emergency presented by the discovery of an unlocked business premise, a situation which, if not a nuisance, nevertheless constituted an invitation to criminality—a condition certainly not less hurtful to the community than the existence of a bad smell. In *Lanthier,* it was a university official who first inadvertently uncovered the contraband in the course of solving the practical problem presented by the exigent event. In this case it was a police officer who stumbled upon the narcotics. But the court in *Lanthier* expressly declined to base its decision on this distinction. Rather, it placed its holding squarely on Fourth Amendment principles. (5 Cal.3d at p. 755.)

Appellant does not argue that discovery of the translucent condoms containing a powdery substance and tied off at the ends was other than a "plain sight" of contraband, identical in effect to the discovery in *Lanthier* of "Baggies" containing a green leafy substance; nor would such an argument be meritorious (cf. *People* v. *Berutko,* 71 Cal.2d 84, 90-91 [77 Cal.Rptr. 217, 453 P.2d 721]).

Finally, consistent with the principle that the scope of a search must be strictly limited to the circumstances which rendered its initiation permissible (*Terry* v. *Ohio,* 392 U.S. 1, 19 [20 L.Ed.2d 889, 904-905, 88

S.Ct. 1868, 1878]; *Gilbert* v. *California,* 388 U.S. 263, 274-275 [18 L.Ed.2d 1178, 1187-1188, 87 S.Ct. 1951, 1957]; *People* v. *Marshall,* 69 Cal.2d 51, 59-60 [69 Cal.Rptr. 585, 442 P.2d 665]), it is noted that the items found elsewhere in the desk and in the shop subsequent to discovery of the contraband are the unlawful product of a general, unprivileged police search. However, appellant does not raise the point, which can be taken as a concession that the evidence of the first-seen contraband, which by itself would have supported a conviction, was the efficient cause of appellant's guilty plea.

The judgment is affirmed.

Gabbert, J., concurred.

**TAMURA, Acting P. J.**—I respectfully dissent.

Assuming that necessity justified entry into the shop to determine whether a burglary was in progress or had been committed (but see *Horack* v. *Superior Court,* 3 Cal.3d 720 [91 Cal.Rptr. 569, 478 P.2d 1]), once the officers checked the premises out and found no unauthorized persons present or evidence of a burglary having been committed, there no longer existed an immediate threat to life, health or property which justified rummaging through the owner's desk drawer however laudable the officers' motives may have been.

The "necessity" upon which the majority seek to justify the search of the desk was no more imminent than the necessity arising out of the quandary faced by the officers in *People* v. *Smith,* 7 Cal.3d 282 [101 Cal. Rptr. 893, 496 P.2d 1261], as to what to do with the child who had been left alone in her apartment. In *Smith* the court commended the officers for their solicitude for the child's safety and welfare but pointed out that the issue was "not simply whether the conduct of Officer Brown might have been 'reasonable' under all the circumstances, but whether the People have shown that his entry into Mrs. Blinn's home falls within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. [Citations.]" (7 Cal.3d at p. 286.) The court held that the "necessity" or "emergency doctrine" "must not be permitted to swallow the rule: in the absence of a showing of true necessity—that is, *an imminent and substantial threat to life, health, or property*—the constitutionally guaranteed right to privacy must prevail." (Italics supplied.) (7 Cal.3d at p. 286.)

*People* v. *Lanthier,* 5 Cal.3d 751 [97 Cal.Rptr. 297, 488 P.2d 625], is clearly distinguishable. There the noxious odor emanating from the locker constituted a nuisance; it posed a present and imminent threat to

the health, safety and welfare of the students. An unlocked business premises, however, without more, does not pose such an imminent threat to life, health or property. The majority poses a threat which was *possible* but not one which was *imminent*.

Under the majority holding, if the police were unable to find evidence of the proprietor's identity in the first desk drawer, presumably they could continue to look through the remaining drawers and perhaps even rummage through file cabinets or other personal effects in order to find evidence of such identity. The mere fact of an unlocked business premises cannot be used to justify such a serious and extensive intrusion into a citizen's Fourth Amendment right of privacy. Other alternative means of safeguarding the premises were apparently not considered. The officers could have wedged the front door shut, called a locksmith, or paid special attention to the premises during patrol.

I would hold the search unlawful under *People* v. *Smith, supra,* 7 Cal.3d 282, and *Horack* v. *Superior Court, supra,* 3 Cal.3d 720, and reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied May 9, 1973.