771 A.2d 389

**George Thomas WENGERT,**

v.

**STATE of Maryland.**

**No. 34, Sept. Term, 2000.**

Court of Appeals of Maryland.

April 16, 2001.

Reconsideration Denied June 1, 2001.

Cynthia E. Young, Annapolis, for petitioner.

Gary E. Bair, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL, and HARRELL, JJ.

RAKER, Judge.

George Thomas Wengert was convicted in the District Court of Maryland, sitting in Anne Arundel County, for the offenses of gambling and keeping a place for gambling in violation of Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 240. He appealed to the Circuit Court for Anne Arundel County and, in a trial de novo, he was again convicted. Wengert challenges the legality of the search and seizure of items taken from his home. In his petition for certiorari he presents a single question: "Where a sole burglar answered the front door of petitioner's house and could have been taken into custody by police without their entry into petitioner's home, was evidence seized from the home by police admissible under the protective sweep exception or any other exception to the Fourth Amendment?" We shall answer the question in the affirmative and, accordingly, affirm the judgment of the Circuit Court.

## I.

There is no dispute as to the facts of this case. On October 22, 1998, at approximately 10:42 a.m., a neighbor who lived

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

behind 311 Edison Street, in Anne Arundel County, Maryland, called the police to report that she had seen a white male enter Petitioner's house through a partially open rear window.

Anne Arundel County Police Officer Benner was the first officer to respond to the call, arriving at Petitioner's home at 11:30 a.m. He proceeded to the back of the house, where he saw the partially open window and the window ledge below it with dust marks and smudges. It appeared to him "as if a person had entered or pulled something in or out of the window." Minutes after Officer Benner arrived, three backup officers joined him—Officers Praley, Mills, and Bishop. Bishop and Benner remained at the rear of the house; Praley and Mills went to the front of the house. Officer Benner called into the house, and a voice from within stated "I'm coming up" or "Yes, I'm coming out."

Officer Bishop instructed the suspect to go to the front door and admit the officers. A person matching the description given by the neighbor, who turned out to be a burglary suspect named Myers, opened the front door. Officer Praley handcuffed Myers, and the two then sat down on the couch in the living room.

Officers Benner and Bishop entered the house, and Benner and Praley questioned the suspect about his presence there. The suspect claimed that his grandmother owned the home, prompting Benner to look for mail that might verify the suspect's identity.

While Officer Praley remained on the couch interviewing the suspect, Benner and Bishop looked in the house for other suspects, victims, and residents. They checked the upstairs level, which took about one minute, and then proceeded to the basement, where they saw a stack of money on a television set, a fax machine set up in front of the television set, a sports pager on the floor by the fax machine, and a "pix ticket." [1]

---

1. The picks sheet was a folded white pamphlet with a drawing of two football players on the cover. The words "PIX" and "Printed for

The officers did not touch or disturb anything in the basement area. While the two officers were downstairs, Officer Praley, who had experience in vice, narcotics, and gambling, saw a paper on the coffee table, which appeared to him to be a tally sheet for record keeping of gambling or drugs.

In Officer Bishop's opinion, the scene as a whole, and particularly the money and the picks ticket atop the television set, led him to believe that the items were evidence of gambling. He testified that it "all just seemed somewhat out of place that you would have a fax machine there right in front of the TV set, and it looked like it was set up so someone could sit there and watch TV, watch sports, and do all their business in one convenient spot." Suspecting a gambling operation, Benner and Bishop called Praley to the basement level.[2] Praley saw the fax machine, tally sheet, pick slip, and cash; he testified "that this is leading us to believe it's gambling and I think we should ... stop and call the vice squad." In fact, that is what they did.

At approximately 11:45 a.m., before the vice squad arrived, Petitioner's twenty-two-year-old son, Joshua, came home. He declined to give the officers consent to search, preferring to wait until his parents came home. His mother arrived home about fifteen minutes later, and she, too, declined to consent to a search of the house, preferring to wait for her husband to come home. Petitioner arrived home around 12:30 p.m.

Vice Squad Detective Middleton arrived sometime between 11:45 a.m. and 12:00 p.m., looked at the papers on the coffee table, as well as the items in the basement, and recognized the papers as a "tally sheet" and "parlay card" used in gambling operations. Middleton told Petitioner that he suspected a

---

Informative Purposes Only and Not An Inducement to Wager" also appeared on the cover, as well as a notation "C118."

2. Another officer, Lt. Little, responding to the original burglary call, arrived at the house about ten to fifteen minutes after Officer Praley went down to the basement, and he, too, went into the basement. Without moving anything, he looked at the items.

gambling operation, and Petitioner and his wife consented to a search of their home.

The police seized approximately $42,000.00 in cash, including the money seen earlier on top of the television and additional amounts found in a closet. The officers also seized other books and papers.

Petitioner filed a motion to suppress the evidence seized from his home. The Circuit Court held a pre-trial evidentiary hearing and denied the motion. The court credited Officer Benner's testimony that his main objective in looking throughout the home was to secure the premises and to ensure that there were no additional suspects or victims in the home. The court found that, in accord with *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), Officer Benner acted reasonably in his initial cursory sweep of Petitioner's basement, limiting his "sweep" to approximately fifteen to twenty seconds and that, within that time period, he also discovered the cash and sports tip card on the television in the basement. The court found that the police seized the items lawfully under the "plain view" doctrine, fully satisfying the requirements of *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). As an alternative holding, the court found that the police entry into Petitioner's home was justified under the police community caretaking function of protecting property, relying on *State v. Alexander,* 124 Md.App. 258, 721 A.2d 275 (1998). As further justification for the search, the court found that the Wengerts consented to a search of the house. Petitioner filed a Petition for Writ of Certiorari in this Court, which we granted, and we shall affirm the Circuit Court.

## II.

Petitioner contends that the evidence should have been suppressed because the police officers' initial entry into the house was unlawful. He argues that, even if the initial entry were permissible, the subsequent detailed search of his house was beyond the scope of a protective sweep or any other

legitimate police function because there was no indication that another suspect was at large, there was no evidence of any weapon, the arrest did not occur inside any residence belonging to the intruder, and there was no need for the police to enter the house to arrest the burglar.

The State counters that the police satisfied the requirements of the Fourth Amendment. The State argues that the police were investigating a crime in progress; they entered Petitioner's house for the sole purpose of detecting other suspects involved in the burglary or victims and, once lawfully inside, they saw in "plain view" evidence indicating that Petitioner was involved in an illegal gambling operation. They secured the premises until Petitioner arrived home and obtained his voluntary consent to search the home. They seized the items that they had previously seen and, pursuant to Petitioner's consent, further evidence of gambling.

Our review of the propriety of the trial court's denial of a motion to suppress evidence is limited to the record developed at the motions hearing. *See Tu v. State*, 336 Md. 406, 412, 648 A.2d 993, 996 (1994). In determining whether the police officers' conduct was reasonable, we consider only those relevant facts produced at the suppression hearing that are most favorable to the State as the prevailing party on the motion. *See Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240–41 (1990). Although we make our own independent appraisal of whether a constitutional right has been violated, we will not disturb the trial court's factual findings unless those findings are clearly erroneous. *See Ornelas v. United States*, 517 U.S. 690, 697–99, 116 S.Ct. 1657, 1662–63, 134 L.Ed.2d 911 (1996); *Riddick*, 319 Md. at 183, 571 A.2d at 1240.

## III.

The Fourth Amendment prohibits only those searches and seizures that are unreasonable. · *See Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991); *Carroll v. State*, 335 Md. 723, 729, 646 A.2d 376, 379 (1994); *McMillian v. State*, 325 Md. 272, 281, 600 A.2d 430,

434 (1992). The Supreme Court has recognized that a warrantless search and seizure does not violate the Fourth Amendment when law enforcement officers are faced with exigent circumstances such that there is a "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (burning building). *See Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (emergency aid); *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976) (hot pursuit); *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (hot pursuit and danger to human life); *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (imminent destruction of evanescent evidence); *Ker v. California,* 374 U.S. 23, 37–41, 83 S.Ct. 1623, 1632–34, 10 L.Ed.2d 726 (1963) (destruction of evidence).

Exigent circumstances are "those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained." *United States v. Robertson,* 606 F.2d 853, 859 (9th Cir.1979). We have noted that "[t]he meaning of exigency implies urgency, immediacy, and compelling need." *Stackhouse v. State,* 298 Md. 203, 212, 468 A.2d 333, 338 (1983). The burden is on the State to establish exigent circumstances that overcome the presumptive unreasonableness that attaches to all warrantless entries of the home. *See Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984); *McMillian,* 325 Md. at 281, 600 A.2d at 434.

A burglary in progress is an exigent circumstance that justifies a warrantless entry of a residence.[3] *See Carroll,* 335 Md. at 734, 646 A.2d at 382; S. Estrella, Annot., *Warrant-*

---

3. Because we affirm the Circuit Court's denial of the motion to suppress on the grounds that exigent circumstances existed, we do not consider the State's alternate argument that the officers' initial entry into the house was lawful pursuant to the police community caretaking function.

*less Search—Burglary,* 64 A.L.R. 5th 637 (1998). In this case, the officers entered Petitioner's residence to investigate a burglary in progress. Therefore, the entry was lawful based on exigent circumstances.

In *Carroll,* we held that "when law enforcement officers have probable cause to believe that a burglary is either in progress or recently has been committed, the exigencies of the situation permit the officers to enter the premises without a warrant to search for intruders and to protect an occupant's property." *Carroll,* 335 Md. at 734, 646 A.2d at 382. We pointed out that "the responsibility of the police to investigate burglaries must be balanced against the serious invasions of privacy such entries and searches entail." *Id.* The justification for the warrantless entry is to look for suspects, to preserve an individual's property, or to ensure the safety of the residents; it is not to enter under a pretext to search for contraband or to investigate illegal activity. *See id.*

A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968). *See Carroll,* 335 Md. at 735, 646 A.2d at 382. The scope of the search must be strictly tied to and justified by the circumstances that rendered its initiation permissible. *See Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969) (quoting *Terry,* 392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d 889); *Ricks v. State,* 322 Md. 183, 188, 586 A.2d 740, 743 (1991). We pointed out in *Carroll* that "the scope of the limited warrantless intrusion we condone today must not exceed that justified by the exigencies presented." *Carroll,* 335 Md. at 735, 646 A.2d at 382. "Thus, when acting on the reasonable belief that a burglary is in progress or has recently been committed, law enforcement officers may not deviate from the original purposes of their search." *Id.*

In determining the reasonableness of the officers' conduct, we consider the facts as they appeared to the officers at the time of their entry. *See id.* at 735, 646 A.2d at 382. The officers were responding to a burglary-in-progress call.

Their concerns as to other possible suspects or the safety of the residents were not eliminated when the suspect responded to their call and answered the front door. It was reasonable for the officers to enter the house for the safety of the residents and to investigate whether there were additional suspects or victims in the house.

Petitioner claims that, even if the officers' initial entry and sweep was justified, once they had completed their sweep of the basement, any justification for their entry had ended. He argues that the entry of the vice squad and that of Officers Praley, Little, and Middleton into the basement was a second search because they were not called downstairs to look for suspects, and there was no longer any need for a protective sweep. He further argues that Bishop, Benner, and Praley were unaware of the significance of the items that they saw, and "hence, no probable cause arose out of their viewing." Petitioner concludes that it was only through the continued searching by officers with expertise in vice that the items were deemed evidence of gambling. As such, the incriminating nature of the evidence was not "immediately apparent" to the officers participating in the initial sweep and should have been suppressed.

The State argues that the officers merely entered the home to arrest the intruder and to search for other suspects and victims, and they came upon evidence in "plain view," causing them to secure the premises. Rather than obtain a warrant, although they could have done so, they obtained consent to search from the property owners.

The Supreme Court recognized in *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971), that, in certain circumstances, a warrantless seizure of items come upon by the police in "plain view" during a lawful search of a home may be reasonable under the Fourth Amendment. *See Horton v. California,* 496 U.S. 128, 133–37, 110 S.Ct. 2301, 2306–07, 110 L.Ed.2d 112 (1990); *Arizona v. Hicks,* 480 U.S. 321, 323, 107 S.Ct. 1149, 1151, 94 L.Ed.2d 347 (1987). The Court has made clear that "[t]he plain-view doctrine is

grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983).

■ In *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), the Supreme Court noted that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Police officers may seize incriminating evidence in "plain view" during the course of a lawful search because such a seizure "does not involve an intrusion on privacy. If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view." *Horton,* 496 U.S. at 141, 110 S.Ct. at 2310, 110 L.Ed.2d 112 (footnote omitted). The justification for the doctrine is "the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would have been in a public place, the inconvenience and the risk to themselves or to preservation of the evidence of going to obtain a warrant." *Hicks,* 480 U.S. at 327, 107 S.Ct. at 1153, 94 L.Ed.2d 347. Also, the doctrine "reflects the fact that requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property, or incriminating evidence generally would be a 'needless inconvenience' that might involve danger to the police and public." *Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983) (internal citation omitted).

■ To invoke the "plain view" doctrine of the Fourth Amendment, the police must satisfy the following requirements: (1) the police officer's initial intrusion must be lawful or the officer must otherwise properly be in a position from which he or she can view a particular area; (2) the incriminating character of the evidence must be "immediately appar-

ent;" and (3) the officer must have a lawful right of access to the object itself. *See Horton*, 496 U.S. at 136–37, 110 S.Ct. at 2308, 110 L.Ed.2d 112.[4]

The requirement that an object's incriminating nature be "immediately apparent" ensures that the "plain view" doctrine is not used to engage in "a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge*, 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d 564. "Immediately apparent," however, does not mean that the officer must be nearly certain as to the criminal nature of the item. *See Brown*, 460 U.S. at 741–42, 103 S.Ct. at 1543, 75 L.Ed.2d 502. Instead, "immediately apparent" means that an officer must have probable cause to associate the object with criminal activity. *See Hicks*, 480 U.S. at 326, 107 S.Ct. at 1153, 94 L.Ed.2d 347; *Riddick*, 319 Md. at 193–95, 571 A.2d at 1245–46; *State v. Wilson*, 279 Md. 189, 195, 367 A.2d 1223 (1977).

---

4. To the extent that our cases have interpreted the "plain view" doctrine under the Fourth Amendment to require that the officer must discover incriminating evidence inadvertently, *see, e.g., Williams v. State*, 342 Md. 724, 757, 679 A.2d 1106, 1123 (1996); *Riddick v. State*, 319 Md. 180, 193, 571 A.2d 1239, 1245 (1990); *Hippler v. State*, 83 Md.App. 325, 330, 574 A.2d 348, 351 (1990), they are disapproved. *See Sanford v. State*, 87 Md.App. 23, 28–31, 589 A.2d 74, 76–78 (1991) (holding that inadvertence not a requirement of "plain view" doctrine).

In *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308–11, 110 L.Ed.2d 112 (1990), the Supreme Court eliminated the inadvertence requirement first set out in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In *Horton*, the Court stated:

[T]he suggestion that the inadvertence requirement is necessary to prevent the police from conducting general searches, or from converting specific warrants into general warrants, is not persuasive because that interest is already served by the requirement[ ] ... that a warrantless search be circumscribed by the exigencies which justify its initiation. Scrupulous adherence to these requirements serves the interests in limiting the area and duration of the search that the inadvertence requirement inadequately protects. Once those commands have been satisfied and the officer has a lawful right of access, however, no additional Fourth Amendment interest is furthered by requiring that the discovery of evidence be inadvertent.

*Horton*, 496 U.S. at 139–40, 110 S.Ct. at 2309, 110 L.Ed.2d 112 (internal citations omitted).

■ Probable cause is a "non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281, 1290 (1988). The Supreme Court defined probable cause in *Brown,* 460 U.S. at 742, 103 S.Ct. at 1543, 75 L.Ed.2d 502, as follows:

> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States,* 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States,* 338 U.S. 160, 176 [69 S.Ct. 1302, 1311, 93 L.Ed. 1879] (1949).

As the name implies, we deal with probabilities. Probable cause is to be determined based upon evaluation of "facts, viewed from the standpoint of an objectively reasonable police officer," *Ornelas,* 517 U.S. at 696, 116 S.Ct. at 1661–62, 134 L.Ed.2d 911, and "not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985). Therefore, the probable cause test is an objective one.

■ Applying these principles, we conclude that the three requirements to invoke the "plain view" doctrine were satisfied.[5] The police were lawfully present in Petitioner's home based on exigent circumstances and were entitled to make a

---

**5.** The dissent relies on the rationale expressed by the Supreme Court of Arizona in *State v. DeWitt,* 184 Ariz. 464, 910 P.2d 9 (1996), to support its conclusion that the search in this case was illegal. *"DeWitt* is a case of successive entries by officers who at first had not found obviously illegal materials in plain view and called in help to confirm mere suspicions." *Mazen v. Seidel,* 189 Ariz. 195, 940 P.2d 923, 928 (1997) (distinguishing *DeWitt* ).

cursory search for accomplices or victims. The items that they seized were immediately apparent to the officers as evidence of a gambling operation. In other words, the police had probable cause to believe that the items they had seen were evidence of crime. Finally, the police had a lawful right of access to the items that they seized, i.e., they discovered the objects while acting within the bounds of the search justified by the exigent circumstances.

We turn first to the document on the coffee table in the living room. Officer Praley saw the document in "plain view." He had been a police officer with the Anne Arundel Police Department for thirteen years and had served as a narcotics officer for a year and a half. He has had training in gambling investigations, had executed search warrants with the vice and narcotics units, and has had specific training in "what to look for, what documents should be captured, what documents should be pointed out to the vice detectives." He testified that he had "also taken action with locating targets in bars that pass out pick sheets, items such as that." Within two or three minutes after he had advised Myers, the burglary suspect, of his *Miranda* rights, Officer Praley observed on the coffee table the document with names, figures and numbers on it and appearing to him to be a tally sheet.[6] It is unreasonable to require Praley to leave the house immediately after

---

The dissent omits several important distinguishing facts present in *DeWitt*. First, the *DeWitt* court noted that it was "conceded that [the two officers'] observations did not provide probable cause to seek a warrant...." *Id.* Second, the items seized in *DeWitt* were not in plain view, "as the DEB officer had to stand on a stool to see far enough into the closet to determine the materials were evidence of drug processing." *Id.* By contrast, in the instant case, when the officers saw the items in the basement and on the coffee table, it was immediately apparent to them that they were viewing evidence of a crime, and, accordingly, they had probable cause.

6. At the close of the suppression hearing, Petitioner's counsel appears to concede that the tally sheet discovered by Officer Praley was admissible. In his argument, he stated to the Circuit Court: "I do truly feel strongly that the entire search of the basement is unconstitutional. And it leads to maybe an interesting situation in this case in that I have intentionally not really discussed much what was on that table upstairs.

arresting the suspect. Indeed, on cross-examination, Praley testified that he waited to hear from the other officers, after they completed their search, that there were no additional suspects or victims. While not participating directly in the search for additional intruders, suspects, or in order to protect the occupant's property, he had lawful access to the document on the table.

Petitioner argues that a brief visual sweep of the house does not include reading documents and thus, Officer Praley did not have probable cause to seize the document. Petitioner is wrong. *Hicks* makes clear that "merely looking at what is already exposed to view, without disturbing it——is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." *Hicks*, 480 U.S. at 328, 107 S.Ct. at 1154, 94 L.Ed.2d 347 The unlawful activity in *Hicks* was not the reading and recording of the serial numbers on the stereo equipment, but rather the moving of the stereo equipment without probable cause to believe that it was stolen. Here, Officer Praley merely read that which was in plain sight. Officer Praley's training and experience made it immediately apparent to him that he was viewing evidence of crime.

We next consider the objects in the basement. We conclude that these items were in "plain view." Officer Bishop had been a police officer with the Anne Arundel County Police Department for approximately twenty years and, during that time, he had specialized training in gambling operations. He served in the patrol division, narcotics division and special operations. While in special operations, he participated in the execution of gambling search warrants and received briefings on items like tally sheets and sports paraphernalia. He entered the residence under exigent circumstances and, in the course of looking for suspects or victims, he discovered items that, based on his experience and training, were "immediately apparent" as evidence of criminal activity. He, thus, had a lawful right of access to the evidence.

---

Well, there was that one tally sheet. . . . So perhaps at the end of the day, that one item is admissible."

Petitioner's final argument is that the subsequent warrantless entry of Detective Middleton and the vice squad was an illegal entry not justified by exigent circumstances, since the emergency had abated and the premises had been secured. We interpret his argument to be that the vice squad officers needed a warrant to enter Petitioner's house and take charge of the seizure.

We conclude that, when law enforcement officers enter a residence in response to exigent circumstances and, during the course of responding to the exigency, come upon evidence in "plain view," but do not immediately take it into custody, a subsequent entry shortly thereafter by officers who arrive to assist in the evidence processing and seizure constitutes a mere continuation of the initial entry and does not require a warrant.[7]

In *Lebedun v. State*, 283 Md. 257, 390 A.2d 64 (1978), Judge Smith, writing for the Court, reviewed a variety of circumstances supporting a warrantless entry under the emergency or exigency doctrine. The primary issue before the Court was whether items seized by police from Lebedun's motel room, linking Lebedun to robberies of several pharmacies, was admissible in evidence. The police had entered Lebedun's motel room, without a warrant, pursuant to a call from the fire department rescue squad, which was responding to a "possible drug overdose" call from the motel.

In holding that the entry and search were lawful, we quoted liberally from *United States v. Green*, 474 F.2d 1385 (5th Cir.1973). In *Green*, while investigating the cause of a fire,

---

**7.** Whether a subsequent warrantless entry is a continuation of the lawful initial entry can only be determined based on the facts and circumstances of the individual case. We emphasize, however, that the later officials must confine their intrusion to the scope of the original invasion unless a warrant or one of the exceptions to the warrant requirement justifies a more wide ranging search. *See, e.g., United States v. Brand*, 556 F.2d 1312, 1317 n. 9 (5th Cir.1977) (quoted in *Lebedun v. State*, 283 Md. 257, 273–74, 390 A.2d 64, 71–72 (1978)). In the instant case, Petitioner consented to the more thorough search.

the fire marshal discovered copper plates used for counterfeiting. He called a Secret Service agent, who came to the scene immediately and took custody of the evidence without a warrant. In upholding the seizure, the court stated:

> Once the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized.

*Id.* at 1390.

Almost every court that has considered this issue has held that a warrant is not necessary because the accused no longer enjoyed a reasonable expectation of privacy in the area where one officer is lawfully present. *See United States v. Brand,* 556 F.2d 1312, 1317 (5th Cir.1977); *Steigler v. Anderson,* 496 F.2d 793, 797–98 (3rd Cir.1974); *United States v. Green,* 474 F.2d 1385, 1390 (5th Cir.1973); *United States v. Herndon,* 390 F.Supp. 1017, 1021–22 (S.D.Fla.1975); *Mazen v. Seidel,* 189 Ariz. 195, 940 P.2d 923, 927–28 (1997); *Wofford v. State,* 330 Ark. 8, 952 S.W.2d 646, 653–54 (1997); *People v. Glance,* 209 Cal.App.3d 836, 845–46, 257 Cal.Rptr. 522 (1989); *People v. Reynolds,* 672 P.2d 529, 533 (Colo.1983); *State v. Eady,* 249 Conn. 431, 733 A.2d 112, 120 (1999); *State v. Magnano,* 204 Conn. 259, 528 A.2d 760, 764–66 (1987); *Hazelwood v. Commonwealth,* 8 S.W.3d 886, 887 (Ky.Ct.App.1999); *Taylor v. State,* 733 So.2d 251, 256 (Miss.1999); *Commonwealth v. Person,* 385 Pa.Super. 197, 560 A.2d 761, 765–66 (1989); *Jones v. Commonwealth,* 29 Va.App. 363, 512 S.E.2d 165, 168 (1999); *State v. Bell,* 108 Wash.2d 193, 737 P.2d 254, 259 (1987); *La Fournier v. State,* 91 Wis.2d 61, 280 N.W.2d 746, 750 (1979); *see also* T. Kruk, Annot., *Warrantless Search–Fire Investigation,* 31 A.L.R.4th 194, 219 (1984). *But see United States v. Hoffman,* 607 F.2d 280, 284–85 (9th Cir.1979).

In *State v. Bell,* 108 Wash.2d 193, 737 P.2d 254 (1987), the Supreme Court of Washington considered whether a deputy

sheriff and a deputy prosecutor needed a warrant to enter defendant's home and seize marijuana discovered earlier by firefighters who had been summoned to the scene of a fire. The court held:

> Once the privacy of the residence has been lawfully invaded, it is senseless to require a warrant for others to enter and complete what those already on the scene would be justified in doing. We hold that where firefighters have lawfully discovered evidence of criminal activity under the plain view doctrine, it is not necessary for sheriff's officers to obtain a warrant before entering a residence to seize the evidence.
>
> There are, of course, limits on the actions of the police. When the police enter the residence, they are not allowed to exceed the scope of the firefighters' earlier intrusion. In essence, they step into the shoes of the firefighters. They cannot enter any area that the firefighters were not justified in entering, nor seize any evidence that the firefighters were not justified in seizing.

*Bell*, 737 P.2d at 259 (internal citations and footnote omitted).

The Supreme Court of Connecticut, in *State v. Magnano*, 204 Conn. 259, 528 A.2d 760 (1987), considered whether the Fourth Amendment required the police to obtain a search warrant before they could enter a home to process evidence otherwise admissible under the "plain view" doctrine. The court held as follows:

> [W]hen a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. Under such circumstances, it is permissible for the detectives to photograph and take measurements, without a search warrant, of evidence which was in the plain view of the initial responding officers. This conclusion is in conformity with decisions in other jurisdictions which have considered the issue, furthers the goal of effective law

enforcement, and promotes the rationale and purposes of the plain view doctrine.

*Magnano,* 528 A.2d at 764. The court pointed out that the defendant could not be heard to complain that her privacy interests were invaded by the second entry because, "as the United States Supreme Court stated in *Illinois v. Andreas,* 463 U.S. 765, 772, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983), '[t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.' " *Id.* at 766.

We align ourselves with the overwhelming majority view across the country. We hold that the evidence in the instant case, which had been observed in "plain view" by the Anne Arundel uniform police officers inside the home while acting under exigent circumstances, and which had been seized by the police, was properly seized without a warrant.[8] Officer Praley and Officer Bishop could have seized the evidence when they came upon it in "plain view." That they summoned other officers to view and to seize the evidence did not require a warrant.

We turn now to the issue of consent. Petitioner's sole argument as to consent was that, because the initial search was illegal, his consent was tainted and did not cure the inadmissibility. Because we hold that the initial search was lawful, there was no fruit of any poisonous tree. All of the items were lawfully seized. Accordingly, we affirm the judgment of the Circuit Court for Anne Arundel County.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS TO BE PAID BY PETITIONER.*

Dissenting Opinion by BELL, C.J., in which ELDRIDGE, J., joins.

---

8. The record in the instant case does not reveal which officer actually took custody of the evidence or when the seizure took place.

BELL, Chief Judge, Dissenting.

The petitioner, Thomas Wengert, has been twice victimized: once by the burglar, who breached the security and privacy of his home and again by the police, who after apprehending the burglar, further breached its privacy. While he undoubtedly appreciates the efforts of the police in catching the burglar, he must deeply resent, and, to me, it is understandable, their creation of an opportunity to investigate, and subsequently charge, him, the victim.

Rather than victimized, the majority maintains that the petitioner was appropriately, and in accordance with proper police procedures and constitutional precepts, charged and convicted of gambling and keeping a place for gambling in violation of Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.), Article 27, § 240. Critical to its conclusion is the showing that the police acted properly both in the apprehension of the burglar and in the manner in which they conducted their investigation following his apprehension, including the use that they made of the petitioner's home.

According to the State, knowledge of the evidence against the petitioner was acquired during a "protective sweep" of the petitioner's premises after the suspected burglar had been apprehended. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276, 281 (1990) teaches that a protective sweep may be justified upon the arrest of a person in a house. As used in that case, "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* The Court pointed out, in its holding, that a protective sweep following a lawful in-house arrest is permitted when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene. *Id.* at 336, 110 S.Ct. at 1099, 108 L.Ed.2d at 288. In *Buie*, the arrest of the defendant occurred in the defendant's home, prompting the Court to observe:

"The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or [*Michigan v.* ]*Long*[, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)] frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."

*Id.* at 333, 110 S.Ct. at 1098, 108 L.Ed.2d at 285.

But that does not describe what occurred in this case. Here, the arrest did take place in a home, but not the home of the person who initially was arrested; rather, it occurred in the home of the petitioner, the burglar's victim. So, it was not because the officers were at the disadvantage of being on the burglar's turf that the "protective sweep" was made. Indeed, the police do not even purport to rely solely on the "protective sweep" authorized by *Buie.* Officer Benner, the first officer on the scene and one of the officers conducting the sweep, stated initially that he made the sweep to secure the premises and ensure that there were neither additional suspects nor victims in the house:

"We looked throughout the residence for anybody else. We asked him [the burglar] if he had anybody with him. He said no. However, we still looked for other suspects. We were looking for a possible resident or a victim that might have been victimized inside the residence."

That is not, however, the only rationale the police offered. Officer Benner later testified that, in addition to checking the area for victims or other suspects, he checked for "anything out of the ordinary. TVs, VCRs, things that might have been tampered with as if to attempt to steal them." Still later, he stated:

"After, like I said, after we looked for suspects and/or victims, we go back and look for—I go back and look for anything tampered with as the intent of the bad guy being in there, what was his intent. Usually you find things tampered with, his intent was most probably to steal with."

And on redirect examination by the State, he made perfectly clear that the purpose of the sweep in this case was not simply for the safety of the officers or the well being of victims. After repeating how he conducted a sweep and cleared a room, Officer Benner stated that "someone else will generally come behind you and conduct their sweep to insure that you didn't miss anything." When asked what he meant by "miss anything," he explained: "Miss any suspects, victims, damaged property, what have you. Whatever the case is that you're looking for."

Sergeant Bishop and Officer Praley confirmed Officer Benner's testimony of there being a broader purpose for the sweep than simply to look for other suspects or victims. According to Sergeant Bishop, it included looking for "some evidence of a burglary also." Officer Praley said that the purpose of the officers going into the basement was "[t]o check for other suspects, to check for evidence of the crime, to check for other—if there was a victim in the house." Sergeant Bishop provided additional insight into the "sweep," yet another reason for making and continuing it:

"We looked around to see if there was anyone else. Then shortly after we looked around some more because the subject we had was claiming that his grandmother lived there. We were trying to find something with a name or something to indicate who actually lived there and see if there was any validity to the story he was trying to tell us."

The first rationale offered by Officer Benner, and confirmed by Sergeant Bishop, is more akin to that underlying *Carroll v. State,* 335 Md. 723, 734, 646 A.2d 376, 382 (1994), where this Court upheld a warrantless entry into an allegedly burglarized home based upon the exigent circumstances exception. In that case, we held:

"that when law enforcement officers have probable cause to believe that a burglary is either in progress or recently has been committed, the exigencies of the situation permit the officers to enter the premises without a warrant to search for intruders and to protect an occupant's property. Just as a burning building creates an exigency that justifies a warrantless entry by fire officials to fight the blaze, a recent or ongoing burglary may create an exigency that justifies a warrantless entry by law enforcement officers to search for intruders and to protect property." [1]

*Id.* Whichever justification applies, because neither sanctions the additional purposes for which the police undertook the sweep in this case, the search in this case fails miserably.

According to one officer, Officer Praley, the house was secured within ten minutes of the police entry. That is consistent with the testimony of both Officer Benner and Sergeant Bishop. The former said that he went to the

---

1.   In dissent in *Carroll v. State*, 335 Md. 723, 744–45, n. 1, 646 A.2d 376, 387, n. 1 (1994), I noted, as to the matter of protecting the property of another:

"A rather clear case of entry to protect the property of another, and perhaps of the occupant of the premises entered, is *United States v. Boyd*, 407 F.Supp. 693 (S.D.N.Y.1976). In that case, water was leaking into a third floor apartment. When the landlord discovered that the leak did not originate in the fourth floor apartment, which was vacant, and that the water was running in the apartment above it, it was appropriate, the court held, to enter that apartment, whose occupant did not respond to the knock, to avoid a dangerous condition, *i.e.*, collapse of ceilings and walls.

"If the police enter premises to abort a burglary, it is at least arguable that they are doing so to protect the owner's property— avoiding its theft is a means of protecting property. It is rather difficult to understand how property is being protected by an entry after the burglary has been completed. In that circumstance, the property owner's remaining property is protected by securing the premises. *See People v. Parra*, 30 Cal.App.3d 729, 106 Cal.Rptr. 531 (1973) in which the court paraphrased § 197 of the Restatement (Second) of Torts (1966) to the effect that 'one is privileged to enter and remain on land in the possession of another if it reasonably appears to be necessary to prevent serious harm to the land or chattels of the other party, unless the actor has reason to know that one for whose benefit he enters is unwilling that he shall take such action.' *Id.* 106 Cal.Rptr. at 533."

basement to sweep it within one minute of entering the house, after having looked in the rear bedroom, which was the direction from which the suspected burglar had come to open the door, and then looking in the living room and kitchen. He also said it took no more than "15, 20 seconds" to determine that there were no other suspects or victims in the basement. Sergeant Bishop offered that the sweep of the basement took no more than a minute and that it was not until 10 to 15 minutes after entering the house that the vice squad detectives were called.

With regard to why the vice detectives were called, Officer Praley,[2] in response to a question, the premise of which was that "the items [observed in the basement, *i.e.*, cash, fax machine, the PIX sheet, the sports pager, and the "tally sheet" he observed in the living room] were not so obvious to [him] as to what they might be, that [he] needed another opinion," confirmed:

"I brought them to the scene for, yes, another opinion; two, for expertise; three, for that's their job. That's what they do. They specialize in that. That's why I brought them there."

To be sure, having completed the sweep and while looking for any tampering with the TVs and the like, Officer Benner, as did the others who came to the basement area, saw a large screen television, on which was sitting a "pile of money" and, next to it, some "pick slips," a fax machine, with a sheet containing names and figures and a sports pager. As to the large screen TV, Officer Benner admitted that it was against the wall so that a suspect could not hide behind it. He also conceded that "a search of that area, at least around the television, . . . could be done rather quickly if you are looking for suspects."

It is likewise true that Officer Praley observed, in the living room of the petitioner's house on a coffee table, a document

---

**2.** Officer Praley was asked to come to the basement to see what Officer Benner and Sergeant Bishop had discovered.

that he characterized as a "tally sheet." [3]   That did not occur until after Officer Praley had handcuffed the suspect and two to three minutes after he had given the suspect Miranda [4] warnings.   Even then, the officer indicated that he did not immediately see the tally sheet;  it was not until he stood up and looked at the paperwork right on the top of the coffee table.   Curiously, the officer stated that he did not recall if he had to touch or pick up the paper to look at it.

The plain view doctrine is an exception to the warrant requirement.  *Texas v. Brown,* 460 U.S. 730, 736, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502, 510 (1983);  *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, 582 (1971);  *Riddick v. State,* 319 Md. 180, 192, 571 A.2d 1239, 1245 (1990).  "The plain view doctrine 'serves to supplement a previously justified intrusion, . . . and permits a warrantless seizure.' "  *Livingston v. State,* 317 Md. 408, 412, 564 A.2d 414, 416, (1989) (quoting *State v. Wilson,* 279 Md. 189, 194, 367 A.2d 1223, 1227 (1977)).  It is applicable, and the seizure of evidence is permitted, when there is prior justification for police intrusion; the evidence is spotted in plain view [5]

---

**3.**  Although the burglary suspect was arrested and handcuffed immediately upon opening the front door of the petitioner's house, rather than taking him away to the station house, Officer Praley kept him in the living room, placing him on the couch directly in front of the coffee table.  Consequently, Officer Praley was in a position to view a paper that lay on the coffee table.

**4.**  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.**  As initially formulated, the Supreme Court of the United States required that the object be inadvertently discovered.  *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, 582 (1971).  In *Texas v. Brown,* 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502, 510 (1983), the Court clarified the inadvertent element:

"[T]he officer must discover incriminating evidence 'inadvertently,' which is to say, he may not 'know in advance the location of [certain] evidence [or contraband] and intend to seize it,' relying on the plain view doctrine only as a pretext."

(Internal citations omitted.)  *Horton v. California,* 496 U.S. 128, 139–40, 110 S.Ct. 2301, 2309–10, 110 L.Ed.2d 112, 124–25 (1990), made

; and the police immediately perceive that what is discovered is evidence. *Williams v. State,* 342 Md. 724, 757, 679 A.2d 1106, 1123 (1996); *Livingston* at 412, 564 A.2d at 417. *See Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347, 355 (1987); *Wiggins v. State,* 315 Md. 232, 250–52, 554 A.2d 356, 364–65 (1989); *Liichow v. State,* 288 Md. 502, 513, 419 A.2d 1041, 1047 (1980). To immediately perceive that what has been discovered is evidence means that, prior to seizure, *Hicks,* 480 U.S. at 326, 107 S.Ct. at 1153, 94 L.Ed.2d at 355; *Wiggins,* 315 Md. at 251, 554 A.2d at 365, or further search to confirm suspicion, *Michigan v. Tyler,* 436 U.S. 499, 512, 98 S.Ct. 1942, 1951, 56 L.Ed.2d 486, 500 (1978); *see Carroll,* 335 Md. at 740, 646 A.2d at 385, the police must have probable cause to believed that the item seized is evidence of a crime.

Assuming that, pursuant to *Carroll,* the police were legitimately on the premises for the purpose of conducting a sweep to determine the presence of other suspects or to see if there were victims, I am far from convinced that what the officers observed in that sweep provided probable cause that the petitioner was violating the law. Only after the sweep had been completed and the officers had begun to investigate whether any property had been tampered with or to look for identification material as to the owner of the premises to verify the statements made by the burglar did the police place themselves in the position to observe incriminating evidence. Thus, this case is totally different from *Carroll,* in which the officers while conducting the exigent circumstances' sweep discovered contraband, which they immediately recognized as contraband.

Certainly having a large screen television and a fax machine, even with a "pile of money" on the television set in one's own home is not, like contraband, a sure fire give-away that the occupant of the house is engaged in any illegal activity. Leaving money around, on the top of a large screen television,

clear that inadvertence was not and never had been a requirement of the plain view doctrine.

in a room with a fax machine, may be somewhat unusual, and maybe even a little eccentric, but it is not yet, at least not until this case, in and of itself, clear evidence of a violation of the law. Nor is the combination of large screen television, fax machine and money in a private home, in open view, such a suspicious circumstance as to make it readily apparent that the owner of the house is engaged in gambling.

In any event, in this case, it is evident that the officers did not immediately have probable cause that the petitioner was running a gambling ring. As pointed out, the sweep was over within two minutes, yet, it was another ten to fifteen minutes before the determination was made to call in the vice detectives. During that time, the officers milled about the petitioner's home, consulting with each other as to the significance of what they had discovered, about what it all meant. Officer Benner and Sergeant Bishop got Officer Praley's advice on what they saw. Lt. Little was shown the set-up and, as indicated, the vice detectives were consulted because of their expertise and to give "another opinion."

*State v. DeWitt*, 184 Ariz. 464, 910 P.2d 9 (1996) is instructive. There an officer believing that he had interrupted a burglary in progress when he arrested a man and his girlfriend in a house for which they had no key and could not provide information with which to contact the owner, conducted a sweep of the house for additional suspects and any evidence of a burglary, during the course of which he came upon items, chemicals, glass vials and laboratory equipment, in storage space above an open closet, which he suspected were used in the manufacture of drugs. Not having the necessary expertise to make the determination, the officer called his supervisor. When he arrived ten minutes later, he observed the items, but was also unable to determine whether they were drug manufacturing equipment, whereupon the assistance of the Drug Enforcement Bureau ("DEB") was sought. Agents from the DEB arrived some 45 minutes later and subsequently obtained a search and seizure warrant, the execution of which resulted in the seizure of among other things drugs and chemicals used in the manufacture of drugs. The

Supreme Court of Arizona reversed the judgment of the intermediate appellate court, which had affirmed the defendant's conviction. Although the court concluded that the initial entry into the premises was justified, as were the observation and limited inspection of the items eventually seized by his supervisor, it held that, at that point, "absent a continued exigency or other valid grounds, the justification for warrantless searching came to an end." *Id.* at 467, 910 P.2d at 12. Thus, the later observations of DEB agents at the officer and his supervisor's request constituted a second and separate search for which there was no justification when it occurred. *Id.* This rationale applies with equal force to the case *sub judice.*[6]

The observation by Officer Praley of what he believed to be a "tally sheet" on the coffee table in the living room fares no better. I question whether the first prerequisite for plain view was met insofar as that observation is concerned. The petitioner was a victim of a burglary. The apprehension of the burglar in his home did not give the police the right to use his home as a branch office. Yet that is precisely what was done in this case. Rather than take the suspect to the station house for booking, he was handcuffed and seated on the victim's couch while questioned, mirandized and while the other officers swept the premises and later searched it for evidence. As the petitioner points out, "Officer Praley was not searching for accomplices or looking for victims while supervising the burglar." Had the suspect been transported to the station house or taken to the police vehicles for processing, Officer Praley, nor any other officer would have been ensconced in the living room, in a position to see the document on the coffee table. In short, there was no prior justification

---

6. I do not agree with the court in *DeWitt,* that the observations of the supervisor were with justification. All justification for further searching ended, I believe, when the officer completed the sweep and did not have probable cause to seek a warrant based on his own observations. Nor do I agree with the court's analysis insofar as it permitted a search for evidence of the burglary; the officer already had it.

for the presence of Officer Praley in the petitioner's home, at that particular place, when the observation was made.

The search, I conclude, was illegal. Consequently, I agree with the petitioner that the subsequent consent he gave was tainted. *McMillian v. State,* 325 Md. 272, 284–87, 600 A.2d 430, 436–37 (1992); *State v. Wilson,* 279 Md. 189, 203, 367 A.2d 1223, 1232 (1977).

Judge Eldridge joins in the views expressed herein.