589 A.2d 74

**Theodore B. SANFORD**

v.

**STATE of Maryland.**

**No. 397, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 1, 1991.

Richard M. Karceski and Thomas P. Bernier (White & Karceski, on the brief), Towson, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. of Baltimore City, on the brief), Baltimore, for appellee.

Submitted before WILNER, C.J., and MOYLAN and ALPERT, JJ.

MOYLAN, Judge.

The appellant, Theodore B. Sanford, was convicted in the Circuit Court for Baltimore City by Judge David Ross, sitting without a jury, of the theft of an antique Seth Thomas clock of the value of $1,000. Judge Ross suspended a three-year sentence and placed the appellant on proba-

tion for three years. The appellant raises the single contention that Judge Ross erroneously failed to suppress the clock as the product of an unconstitutional search and seizure. Involved in that ruling were several nuances of the Plain View Doctrine.

From the agreed statement of facts on which this case was tried, it is apparent that the form of theft for which the appellant was convicted was that formerly known as receiving stolen goods. The evidence strongly suggested that the appellant was running a professional fencing operation out of Ted's Lounge at 4507 Pennington Avenue in South Baltimore. A search of that premises on February 3, 1989 was conducted by Baltimore City police, joined by officers from both Anne Arundel and Baltimore Counties.

It was the Anne Arundel County officers who had been instrumental in amassing the probable cause for the search warrant. The warrant authorized the police to search for various specifically described computers and computer equipment originally stolen in the course of three separate burglaries in Anne Arundel County, all perpetrated in November, 1988. The Seth Thomas antique clock had no connection with the Anne Arundel County burglaries or with the Baltimore City search warrant aimed at discovering the fruits of those burglaries.

There was also no suggestion that the appellant was involved in any of the burglaries or directly involved in the theft of the Seth Thomas clock. His only involvement was as the receiver of stolen goods; Baltimore City's only involvement was as the *situs* of his fencing operation. The burglars (and thieves) were Raymond Robinson and his live-in girlfriend, Barbara Woods. It was they who perpetrated the Anne Arundel County burglaries and who sold the fruits thereof to the appellant.

After the Anne Arundel police notified Baltimore City that the fencing of the stolen property was taking place in the City, Detective McLaughlin, of the Baltimore City Police Department's Property Crime Section, took charge of that

aspect of the investigation. It was Detective McLaughlin who applied for the search warrant that was executed on Ted's Lounge on February 3, 1989.

Baltimore County became involved in the joint investigation when Robinson and Woods attempted to use a stolen credit card that had been taken in the course of a Baltimore County burglary on October 25, 1988. It was yet another Baltimore County burglary, that of the home of Ms. Olive Louise Warner at 210 Stocksdale Avenue in Reisterstown on December 23, 1988, in which the Seth Thomas antique clock was taken. Although neither the agreed statement of facts nor the search warrant application goes into full detail, it appears that Raymond Robinson and Barbara Woods were arrested at sometime before January 26, 1989. Found in the trunk of Robinson's car at the time of his arrest was another item belonging to Ms. Warner, taken at the same time the Seth Thomas clock was taken.

Prior to applying for the search warrant, Detective McLaughlin had gone to the Anne Arundel County Detention Center on January 26 to interview Barbara Woods. Ms. Woods confirmed her involvement with Robinson in the Anne Arundel County burglaries and confirmed that the two of them had sold the computers and computer parts to the appellant at Ted's Lounge. She also indicated that the two of them had sold stolen goods to the appellant on a number of occasions. She further revealed that she and Robinson had been involved in several Baltimore County burglaries. She specifically mentioned the antique clock which had been stolen by them in Baltimore County.

Although the central purpose of the investigation was to prove the appellant's involvement in the fencing of the stolen computer equipment from Anne Arundel County, Baltimore County authorities were invited to participate in the investigation and in the February 3 raid in order to benefit from any "spin-off" evidence that might coincidentally turn up and be of assistance to them. Detective Edward Lee Bradley led the Baltimore County police contingent in the February 3 execution of the search warrant at

Ted's Lounge. It was Detective Bradley, moreover, who, during the course of the search of Ted's Lounge, recovered the Seth Thomas clock that became the subject of the suppression hearing.

## The Plain View Doctrine

The warrant authorizing the search of Ted's Lounge was constitutionally proper in every respect. Indeed, the appellant does not challenge it. The scope of what may be done under an indisputably proper warrant, however, is limited by the command of the particularity clause. The application for the warrant did not remotely seek authorization to search for or to seize the Seth Thomas clock. The warrant itself contained no such authorization. The clock, therefore, was not seized under authority of the warrant.

The only arguable theory of legitimacy is that it was a reasonable warrantless seizure under the aegis of the Plain View Doctrine exception to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 464–473, 91 S.Ct. 2022, 2037–2042, 29 L.Ed.2d 564, 581–587 (1971); *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Horton v. California,* 495 U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Three conditions must be satisfied for there to be a reasonable seizure under the Plain View Doctrine:

1. There must be a prior valid intrusion into the constitutionally protected area;

2. There must be a spotting in plain view of the item ultimately seized; and

3. There must be probable cause to believe that the item spotted in plain view is evidence of crime.

In this case, Ted's Lounge, in terms of the late-night hour of the search and the nonpublic parts of the establishment that were subjected to the search, was a constitutionally protected area. The police entered the establishment and conducted the search, however, under a validly issued

search and seizure warrant. In the course of searching for the items particularly described in the warrant, the Seth Thomas antique clock was discovered and seized. Prior to that seizure, there clearly was a valid intrusion into the constitutionally protected area.

### Inadvertence Not Required

■ The second necessary condition is that the item ultimately seized shall have been spotted in plain view. This requirement ensures that the police do not go searching for an item not particularized in the search warrant— that what begins as an initially good search not degenerate into a "fishing expedition" or general rummaging about. In this case, Detective Bradley spotted the Seth Thomas clock on a shelf behind the bar in full view of everyone. No lids or covers were lifted; no drawers were opened; no closets were ransacked. There was simply no searching for the Seth Thomas clock at all.

The appellant points out, however, that this plain view spotting of the clock was advertent rather than inadvertent. We agree with the appellant. Detective Bradley fully anticipated that the Seth Thomas clock, and other stolen items from Baltimore County, might be found in Ted's Lounge. He was not at all surprised by what he saw. Indeed, his strong suspicions in this regard were reassuringly confirmed. What then is the significance of this absence of inadvertence?

The Plain View Doctrine was born in 1971 in the plurality opinion (with respect to this part of the opinion, Part IIC) of Justice Potter Stewart in *Coolidge v. New Hampshire, supra.* Justice Stewart, to be sure, added the additional requirement to the second necessary condition that the plain view spotting be inadvertent. "The second limitation is that the discovery of evidence in plain view must be inadvertent." 403 U.S. at 469, 91 S.Ct. at 2040, 29 L.Ed.2d at 585. Not only the inadvertence requirement, but, indeed, the entire Plain View Doctrine was, however, only persuasive and not authoritative precedent. Justice Harlan, the neces-

sary fifth vote, concurred in the decision that Coolidge's conviction be reversed and concurred in other parts of the opinion but pointedly declined to concur in Part IIC, announcing the Plain View Doctrine. In vehement dissent, moreover, Justice White objected mildly to the general concept of the Plain View Doctrine but railed vehemently against any inadvertence requirement.

Except for a fleeting and peripheral appearance in *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), not remotely involving this issue, the second coming of the Plain View Doctrine had to await *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). The Supreme Court there, in another plurality opinion, pointed out that the Plain View Doctrine was only the persuasive product of a mere plurality. They did observe, however, "While not a binding precedent, as the considered opinion of four Members of this Court, it should obviously be the point of reference for further discussion of the issue." 460 U.S. at 737, 103 S.Ct. at 1541, 75 L.Ed.2d at 511. Concurring, Justice White pointed out that the plurality opinion did not purport to endorse the inadvertence requirement, which he continued to condemn. 460 U.S. at 744, 103 S.Ct. at 1544, 75 L.Ed.2d at 515. The Plain View Doctrine only achieved status as a constitutionally binding, majority opinion of the Court in *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). The decision in *Hicks*, however, did not require the Court to take a position on the inadvertence requirement. Once again, Justice White concurred, pointing out that the inadvertence requirement had never commanded a majority of the Court.

It was in *Horton v. California*, 495 U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), that the Supreme Court was finally called upon to take an authoritative position for or against the inadvertence requirement. Justice Stevens wrote for a 7-to-2 majority. Acknowledging that its decision was one of first impression, the Court found Justice White's stubborn and steadfast opposition to inadvertence

over the years more logically compelling than Justice Stewart's earlier championing of it. The holding was clear:

> "We conclude that even though inadvertence is a characteristic of most legitimate 'plain view' seizures, it is not a necessary condition."

495 U.S. at —— – ——, 110 S.Ct. at 2304, 110 L.Ed.2d at 118–119. After setting out Justice Stewart's arguments in *Coolidge* in favor of an inadvertence requirement, the Court flatly rejected the rationale:

> "We find two flaws in this reasoning. First, evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in an area and duration by the terms of a warrant or a valid exception to the warrant requirement....
>
> Second, the suggestion that the inadvertence requirement is necessary to prevent the police from conducting general searches or from converting specific warrants into general warrants, is not persuasive because that interest is already served by the requirements that no warrant issue unless it 'particularly describe[s] the place to be searched and the persons or things to be seized,' ... and that a warrantless search be circumscribed by the exigencies which justify its initiation.... Scrupulous adherence to these requirements serves the interests in limiting the area and duration of the search that the inadvertence requirement inadequately protects. Once those commands have been satisfied and the officer has a lawful right of access, however, no additional Fourth Amendment interest is furthered by requiring that the discovery of evidence be inadvertent." (citations omitted).

495 U.S. at —— – ——, 110 S.Ct. at 2309–2310, 110 L.Ed.2d at 124–125.

At one end of the spectrum of subjective expectation, had Detective Bradley of Baltimore County been utterly shocked at the unanticipated bonanza of discovering the Seth Thomas clock, the Plain View Doctrine, of course, would not have been offended. At the other end of the spectrum, had Detective Bradley joined the raiding party with mathematical certainty that the clock would be found and warrantlessly seized, the Plain View Doctrine would be similarly indifferent. In the more intermediate and equivocal ranges of expectation, hope, or chance, the Plain View Doctrine would be equally unconcerned. The subjective state of Detective Bradley's expectations simply did not matter.

The *Horton* opinion referred specifically to the situation prevailing in this case. The police unquestionably had a valid warrant to search Ted's Lounge for the computer equipment stolen in the burglaries in Anne Arundel County. Whether their degree of certainty with respect to the presence of other stolen goods taken in the Baltimore County burglaries was enough to support the inclusion of those items in the warrant is beside the point for present purposes. As the Supreme Court observed, at —— U.S. ——, 110 S.Ct. 2309, 110 L.Ed.2d 124:

> "[I]f he or she has a valid warrant to search for one item and merely a suspicion concerning the second, *whether or not it amounts to probable cause*, we fail to see why the suspicion should immunize the second item from seizure if it is found during a lawful search for the first." (emphasis supplied).

## Probable Cause:

### *When Do We Measure It?*

The third necessary condition for a warrantless Plain View Doctrine seizure is probable cause to believe that the thing seized is evidence of crime. As an investigation rapidly unfolds and as incriminating clues progressively accumulate, it is necessary to pinpoint the precise moment

when a Fourth Amendment seizure of personal property first occurs so that we can measure the adequacy of the probable cause that has developed as of that moment.

In this case there was both an ultimate seizure of the Seth Thomas clock and also a preliminary seizure, with at least one item of incremental incrimination accruing after, and as a result of, the preliminary seizure. The ultimate seizure occurred when the police team removed the Seth Thomas clock from Ted's Lounge, inventoried it, and carried it to the police property room. The preliminary seizure occurred when Detective Bradley removed the clock from the shelf whereon he first spotted it and placed it on top of the bar for further examination.

Part of the description of the Seth Thomas clock taken in the course of the December 23 burglary in Reisterstown was the fact that it had a key inside it. After removing the clock from a shelf and placing it on top of the bar, Detective Bradley opened the back of it and found a key inside, thereby confirming his belief that the clock was, indeed, the fruit of the Baltimore County burglary. The appellant stoutly maintains that the critical initial seizure in this case occurred not when the clock was ultimately removed from Ted's Lounge to the police station but when it was preliminarily removed from the shelf to the top of the bar and that, therefore, the discovery of the key cannot be considered in assessing the probable cause.

We agree with the appellant completely and find the opinion in *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), dispositive in his favor on this point. In *Arizona v. Hicks*, the police were searching a suspect apartment for a possible gunman and for weapons. In the course of that search, they spotted in plain view various expensive stereo components which, in that "squalid and otherwise ill-appointed four-room apartment," they suspected of being stolen. To confirm their suspicions, they moved, turned over, or tilted upward several of the components in order to read their serial numbers. Before the components were ultimately taken to the police property

room, a telephone check of the serial numbers revealed indisputably that they had been stolen. The critical Plain View Doctrine issue in *Arizona v. Hicks*, however, was whether probable cause had to exist prior to the initial lifting or tilting of the items rather than prior to their ultimate removal by the police from the apartment. As Justice Scalia concluded for the Court, at 480 U.S. 324–325, 107 S.Ct. 1152:

> "Officer Nelson's moving of the equipment ... did constitute a 'search' separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment. Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest.... But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry. *This is why ... the 'distinction between "looking" at a suspicious object in plain view and "moving" it even a few inches' is much more than trivial for purposes of the Fourth Amendment.* It matters not that the search uncovered nothing of any great personal value to the respondent—serial numbers rather than (what might conceivably have been hidden behind or under the equipment) letters or photographs. A search is a search, even if it happens to disclose nothing but the bottom of a turntable." (citations omitted) (emphasis supplied).

And *cf. Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639, 659–660 (1989).

█ The data that may be considered in assessing the necessary probable cause in this case is that which had accrued as of the moment Detective Bradley first laid hands upon the clock and picked it up in order to move it to the top

of the bar. The discovery of the key inside the clock, therefore, can play no role in that assessment.[1]

## Probable Cause:

### Did It Exist?

We read Judge Ross' analysis as one that ruled that adequate probable cause existed even before the discovery of the key. He concluded that Detective Bradley looked for the key, whether he thought he had to or not, in order to confirm his initial suspicion but that the finding of the key was not indispensable to the probable cause determination. Judge Ross observed:

> "He [Detective Bradley] thought he already had probable cause. He confirmed his suspicion of it being a Seth Thomas by opening it to see if the key was inside. That was really conducted after the probable cause had been established."

---

1. We do not attach any significance to another small shred of speculation that looms large in the appellant's mind but has little or no evidentiary base. From a brief and fleeting partial answer or nonanswer before cross-examination moved immediately to a totally unrelated subject, the appellant extrapolates the datum that Detective Bradley could not read the label "Seth Thomas" from a point ten or fifteen feet away from the clock. In reviewing the entire transcript from the suppression hearing, we can find no reference to the fact that the clock even bore a label saying "Seth Thomas" or that Detective Bradley, then or later, ever read such a label and relied upon it. The appellant, however, seems simply to assume that he did.

   The appellant assumes further that if Detective Bradley could not read the label from ten or fifteen feet away, then he must have read the label only after he picked up the clock and placed it upon the bar. There is a flight of logic here that we cannot follow. Even assuming that there was a label and that Detective Bradley ultimately read it and relied upon it, the fact that he could not read it from ten or fifteen feet away by no means suggests that he could not have read it when only ten or fifteen inches away. Anything that occurred in the course of his approach even a millimeter away or even a millisecond before he picked up the clock would represent a datum that "made it under the wire" for probable cause assessment purposes.

   Even if such an evidentiary shred existed in this case, however, it would by no means have been vital to the necessary accumulation of probable cause, whether it made it under the wire or not.

Quite aside from what legal conclusions, if any, Detective Bradley may have entertained with respect to the clock, we do not hesitate to hold that the information in his mind linking the clock he saw with the clock that had been taken six weeks earlier in Reisterstown was enough to establish probable cause in the eyes of the law.

Detective Bradley initially had compelling evidence of the fact that the December 23 burglary in Reisterstown, in the course of which the Seth Thomas antique clock was stolen, was perpetrated by Raymond Robinson and Barbara Woods. When Raymond Robinson was arrested shortly after that burglary, another item taken in the same burglary was found in the trunk of his car. Barbara Woods, moreover, acknowledged having participated in a Baltimore County burglary in which an antique clock was taken.

Detective Bradley also had strong evidence that the Seth Thomas clock, along with multitudinous other stolen items from Baltimore and Anne Arundel Counties, had been sold by Raymond Robinson and Barbara Woods to the appellant at Ted's Lounge in South Baltimore as part of a regular fencing operation. Barbara Woods remembered their selling of the clock. Though she did not specifically pinpoint Ted's Lounge as the market for that particular fencing operation, it was clear from the larger context of her police interview that the appellant was for her and Raymond Robinson, their regular family fence. There were indications that they had fenced stolen goods with the appellant at Ted's Lounge on ten or twelve occasions. There was no remote indication that they ever took any of their trade elsewhere. The reasonable inference, therefore, was that any "hot goods" they sold, they sold to the appellant.

As Detective Bradley indicated in his testimony at the suppression hearing, his information with respect to the location of the Seth Thomas clock was very specific:

"Q: What information did you have prior to entering the establishment on the offense report that is already in evidence that connects this clock with the Defendant?

A: In Baltimore County, I had received information from Detective McLaughlin that Barbara Woods and Raymond Robinson had done burglaries in Baltimore County, and had sold some of the propert[y] to Ted's Bar."

When asked specifically about the clock, Detective Bradley testified:

"Q: Now, what information did you have about this clock prior to going into this establishment as it relates ... to the Defendant in this case, Ted Sanford?

A: I had information that Barbara Woods and Raymond Robinson had sold the stolen property at Ted's Bar."

On yet a third occasion, he focused in closely upon the connection between the stolen clock and Ted's Lounge:

"A: On December 23rd, 1988, a Raymond Robinson was arrested in Baltimore City. Subsequent to the investigation, the property was obtained in the trunk of the vehicle he was driving. The contents in the trunk of that vehicle was an Irish Setter Metal Door Stop. This particular piece of property was also reported stolen along with the clock from 210 Stocksdale Avenue, and the owner is Olive Louise Warner.

Q: Again, that was Raymond Robinson's car, is that correct?

A: That's correct. Raymond Robinson and Barbara Woods stated they sold the property at Ted's Bar."

As Detective Bradley moved in with the rest of the raiding party on Ted's Lounge on the late evening of February 3, everything he saw fortified his earlier conclusions. The entire small bar, or building fronting as a bar (there was no indication of patrons or customers when the searching party arrived at between 10 and 11 P.M.), was bursting at the seams with stolen goods. Detective McLaughlin was a veteran of the Baltimore City Crimes Against Property Division and a specialist in the *modus operandi* of fencing schemes. He described Ted's Lounge as a large-scale, professional fencing operation. The basement was a veritable warehouse with boxes and cartons of

stolen items piled high. There were, for instance, dozens of brand new appliances, many with the price tags still attached.

The essentially nefarious nature of Ted's Lounge was apparent to Detective Bradley long before he spotted the stolen clock. He had spent almost an hour with Detective McLaughlin in the basement, surveying the vastness of the fencing operation, before coming up to the first floor, where he spotted the clock. As he, now on the first floor, carried out his part of the mission, which was to keep a weather eye out for items stolen in Baltimore County, including the antique Seth Thomas clock, it would not have been unreasonable to assume that everything in the building was stolen property.

When he first saw the clock sitting on a shelf behind the bar, he immediately communicated its significance to Detective Sergeant Joseph Richardson of the Baltimore City Police Department:

"Q: What did you say when you saw this clock?

A: I advised him that appeared to be a clock we had stolen from Baltimore County in a theft in a daytime housebreaking."

The clock was sitting on its marble post, just as had been described. When pressed with respect to his ability to recognize an antique Seth Thomas clock, Detective Bradley was firm:

"Q: Is there any reason why you didn't ask Ms. Warner to show you the photograph before you went to Ted's Bar so you would know what the clock looked like?

A: I told you all I knew what a Seth Thomas clock looked like because I had seen one prior to the time of February 3, 1989. I grew up with my grandmother, and I lived with one for twelve years.

Q: That one is the only Seth clock you had seen in your lifetime?

A: No.

Q: [Exclusive] of this one?

A: There is another type of Seth Thomas clock with a different type of post.

Q: Did I hear you on direct examination, and correct me if I am wrong, your grandmother's clock was the only one you had seen of this variety prior to February 3rd, 1989 with the marble posts?

A: Yes.

Q: You have seen a multitude of Seth Thomas clocks as the one with the marble posts?

A: I did not see a multitude. I have seen others."

The appellant, finally, protests with a sense of offended dignity that:

"A mantel clock, on a mantel, is not of such a distinctive character so as to immediately lead one to believe that it is stolen. Mantel clocks are routinely found in business settings without creating the assumption that they are stolen."

That may be true—in a vacuum. The scene at Ted's Lounge, however, did not exist in a vacuum, but was one lifted straight from the pages of *Oliver Twist.* It is one thing to accept with benign equanimity an antique clock sitting on a mantel in a business establishment. It is something quite different to fail to see the significance of just such a clock sitting on a mantel if the business establishment is Fagin's den of thieves and you are armed with the knowledge that Bill Sykes and Nancy have stolen such a clock within the little month and have confessed, moreover, to having just fenced the clock with Fagin.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.