781 A.2d 902

Troy WHITE,

v.

STATE of Maryland.

No. 1969, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 19, 2001.

522

Brian J. Murphy, Assigned Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief), for appellee.

Argued before MURPHY, C.J., and KRAUSER, and L. LEONARD RUBEN (Retired, specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Baltimore County, a jury (the Honorable John Grayson Turnbull, II, presiding) convicted Troy White, appellant, of first degree felony murder and related offenses, including use of a handgun in the commission of a felony. The State's evidence was sufficient to establish that he committed each of those offenses. This appeal involves appellant's challenges to the admissibility of that evidence and to Judge Turnbull's felony murder instruction. Appellant presents us with three questions:

I. Did the trial court err in declining to suppress evidence derived from conversations regarding the crime of robbery which were intercepted during a narcotics wiretap?

II. Did the trial court err in declining to suppress appellant's statements to homicide detectives which were made after he had invoked his right to counsel?

III. Did the trial court err in refusing to grant appellant's requested instruction on felony murder?

For the reasons that follow, we shall affirm the judgments of the circuit court.

## Factual Background

About 11:00 a.m. on February 7, 2000, appellant and three other men participated in a robbery at J. Brown Jewelers, a store located on Reisterstown Road.[1] Bruce Prothero, an off-duty Baltimore County police sergeant, working as a security guard at the store, was fatally shot by one of the robbers.

---

1. Surveillance photographs showed that the first two men who entered the store—Wesley and Richard Moore—each carried a handgun, that appellant and a fourth man—Donald White—entered the store carrying bags, and that appellant smashed and reached into a display case.

Approximately 30 watches, worth about $400,000, were stolen in the robbery.

On the day after the robbery, appellant was arrested by Baltimore County detectives who were able to identify him as a result of telephone calls that he made to a telephone number that was the subject of a wiretap order issued by a judge of the Circuit Court for Baltimore County. On January 14, 2000, the monitoring officers had intercepted an incoming telephone call from an individual identified as "Fats" (later identified as appellant) to Marcel Walton, one of the wiretap targets. During this call, "Fats" discussed his participation in a "smash and grab" jewelry store robbery in Tysons Corner, Virginia, during which expensive watches had been stolen. On February 7, 2000, while "working" the Walton wiretap, Detective Izaac Hester learned about the J.Brown "smash and grab" robbery and the murder of Sergeant Prothero.

Suspecting that "Fats" might be involved in that robbery, Detective Hester immediately notified the supervising judge that the detectives monitoring Walton's telephone calls might overhear a discussion about the robbery. The supervising judge directed the officers to continue "spot monitoring" of incoming calls, in conformity with the "minimization" requirement of the wiretap order. The monitoring officers proceeded to intercept a series of calls between Walton and appellant. In one of the intercepted conversations, appellant informed Walton "that he had some Cartiers and Rolexes."

Through the use of the court ordered surveillance equipment, the detectives were able to determine that "Fats" made one of the calls from a phone located at 1013 North Ellamont Street in Baltimore City, and a surveillance was set up outside that address. At about 1:15 p.m. on February 8, 2000, appellant emerged from 1013 North Ellamont Street, walked in one direction, then in the other direction, crossed the street, looked into the surveillance van, and began running. After appellant was captured, the police searched the residence with the consent of its occupant, Rachel Potts ("Potts"). A search of the living room turned up a plastic bag containing watches.

The bag had been stuffed into a couch.[2]

On the day of his arrest, appellant initially invoked his right to counsel, but when Detective Phillip Marll advised him that he was being charged with first degree murder, he responded, "How can you charge me with murder?  I didn't kill nobody." Appellant was presented with a statement of charges, and at this point stated that he "went in, broke a few display cases, stole some watches, but . . . did not kill anyone." Appellant thereafter executed a written acknowledgment of his *Miranda* rights and waiver of his right to counsel.  Eventually, he made a full statement, admitting that he "played a part in it," but emphasizing that he did not have a gun and stated several times that "[n]o one was supposed to get hurt."  Appellant claimed that, at the time Sergeant Prothero was shot, he and Donald White had already "pulled off the lot going to the rear of the store," and that he did not even know who fired the fatal shot until later that day, when he "saw it on the news about the police officer," at which point "Tony (Richard Moore) told [appellant] that [Moore] had to shoot the man." Appellant also told the detectives where they could find the cars used in the robbery, where they could find the clothes he wore during the robbery, and where he purchased the mauls used to break the display cases.

## Discussion

### I.

■  Appellant argues that, even though his conversations were intercepted during the execution of a wiretap order that had been issued in strict compliance with all of the applicable Maryland and federal statutory requirements,[3] we must apply

---

**2.** Potts testified at trial that she had met appellant, also known as "Fats," in a nightclub on New Years Eve. When she came home from work sometime after 11:00 p.m. on February 7, she discovered that appellant had been let into her house by her daughter.  Appellant spent that night at the house, sleeping on the couch from which the bag of watches was seized.

**3.** Appellant's trial counsel argued that the wiretap order should not have been issued because the application and supporting affidavit failed

the fruit of the poisonous tree doctrine to the discovery of his identity and whereabouts because that information was derived from the interception of the telephone calls he placed on February 7, 2000.[4] There is no merit in that argument.

According to appellant, because the wiretap order authorized only the interception of conversations involving violations of the Maryland Controlled Dangerous Substances Act—and had not been amended at anytime thereafter—surveillance of appellant's conversations about the February 7th robbery violated his Fourth Amendment and statutory rights. This argument is based on the proposition that, because the monitoring officers intercepted prior conversations about robberies, there was nothing "unanticipated" about the phone calls he placed on February 7, 2000, and the information derived from the interception of those phone calls must be suppressed because the monitoring officers had failed to "apply" as soon as practicable after January 14th for judicial authorization to intercept the now "expected" conversations regarding the crime of robbery. Appellant argues in his brief that the police were required to

apply "as soon as practicable" for judicial authorization to continue to listen to the now expected conversations regarding the crime of robbery. *See* Maryland Code, Courts and Judicial Proceedings Article (1998 Repl.Vol.) Section 10–407(e); ...

... What would be "reasonable under the circumstances," then, would be for the police to follow both their strict

---

to establish the necessity for a wiretap. That argument is not repeated in this appeal.

4. Section 10–405 of Maryland's Wiretapping and Electronic Surveillance Act provides:

Whenever any wire or oral communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this State, or a political subdivision thereof if the disclosure of that information would be in violation of this subtitle.

Md.Code (1998 Repl.Vol.), Cts. & Jud. Proc., section 10–405.

written minimization guidelines and the statutory mandate of Courts and Judicial Proceedings Article, Section 10–407(e) and seek an amended court order authorizing the interception of robbery conversations.

Even though Md.Code (1998 Repl.Vol.), Cts. & Jud. Proc., section 10–407(e) (and its federal counterpart, 18 U.S.C. 2517(5)) is of no consequence to the issue of whether a wiretap order should be *amended* to authorize the future interception of conversations pertaining to crimes that were not specified in the original wiretap order,[5] "we have no difficulty discerning the precise nature of appellant's contention." *Sherman v. State,* 288 Md. 636, 640, 421 A.2d 80 (1980). We must decide whether there is merit in appellant's contention that the State was required to petition for an amendment to the wiretap order that would authorize interception of conversations relating to the crime of robbery.

Md.Code (1998 Repl.Vol.), Cts. & Jud. Proc., section 10 408(e)(3), provides in pertinent part that

[e]very order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon

---

5. That section provides:

*Communications relating to offenses not specified in order.*—When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (a) and (b) of this section. The contents and any evidence derived therefrom may be used under subsection (c) of this section when authorized or approved by a judge of competent jurisdiction where the judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this subtitle. The application shall be made as soon as practicable.

Subsections (a) and (b) authorize law enforcement officers to disclose and make use of evidence derived from the execution of an electronic surveillance order. No "application" is required for the disclosure and use provided for in subsections (a) and (b). Although subsection (c) does require a "subsequent application," appellant does not argue that the State violated this subsection at any point *after* discovering his identity and whereabouts, and the State's case against appellant did not include disclosure of the contents of any conversation.

as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this subtitle, and must terminate upon attainment of the authorized objective, or in any event in 30 days.

The minimization requirement exists "to prevent unnecessary intrusion into the privacy of the surveillance target ..." *Ezenwa v. State*, 82 Md.App. 489, 508, 572 A.2d 1101 (1990)(quoting *Poore v. State*, 39 Md.App. 44, 64, 384 A.2d 103, *cert. denied*, 282 Md. 737 (1978)).

In *State v. Mazzone*, 336 Md. 379, 383, 648 A.2d 978 (1994), the Court of Appeals confirmed that compliance with the minimization mandate in an intercept authorization order is a "post condition," that is, an action "that must be taken after a valid wiretap order has been issued." Unlike violations of a precondition, which are evaluated under a "strict compliance" standard and which require the suppression of all evidence derived from the wiretap, post conditions are evaluated under a "substantial compliance" standard. *Id.* at 383–84, 648 A.2d 978. The Court explained:

> In the context of minimization, the substantial compliance standard is actually a reasonable compliance standard, which evaluates "the overall reasonableness of the totality of the conduct of the monitoring agents in light of the purpose of the wiretap and the information available to the agents at the time of the interception."

*Id.* at 384, 648 A.2d 978 (quoting *Spease v. State*, 275 Md. 88, 99, 338 A.2d 284 (1975)). The *Mazzone* Court "emphasize[d] that minimization is not prohibition" and stated that "spot monitoring" may be necessary to determine if a communication falls within the scope of the authorization order. *Id.* at 391, 648 A.2d 978.

When deciding a motion for suppression based on a "failure to minimize" argument, the court must consider ten factors:

> (1) the nature and scope of the crime being investigated;
> (2) the sophistication of those under suspicion and their

efforts to avoid surveillance through such devices as coded conversations; (3) the location and the operation of the subject telephone; (4) government expectation of the contents of the call; (5) the extent of judicial supervision; (6) the duration of the wiretap; (7) the purpose of the wiretap; (8) the length of the calls monitored; (9) the existence of a pattern of pertinent calls, which the monitoring agents could discern so as to eliminate the interception of non-pertinent calls; (10) the absence of monitoring of privileged conversations.

*Id.* at 393–94, 648 A.2d 978. The *Mazzone* Court also noted that, even if a monitoring officer's actions are found to be unreasonable, "the sanction would not be to suppress all communications intercepted by the monitoring agents. The maximum sanction for violation of the reasonable compliance standard, in the circumstances of [that] case, would require suppression of only the conversations that were unreasonably intercepted." *Id.* at 398, 648 A.2d 978.

It is well settled that the plain view doctrine is applicable when an officer executing a court authorized wiretap for drug related conversations overhears conversations related to other offenses. Appellant's Fourth Amendment rights were not violated because, "even though inadvertence is a characteristic of most 'plain view' seizures, it is not a necessary condition." *Horton v. California,* 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990). *See also Sanford v. State,* 87 Md.App. 23, 28–31, 589 A.2d 74 (1991), and *Wengert v. State,* 364 Md. 76, 89, 771 A.2d 389 (2001) (both holding that inadvertence is not a requirement of the "plain view" doctrine). Neither the Fourth Amendment nor any applicable statute [6] requires law enforcement officers to avoid intercepting all nonrelevant conversations when conducting a wiretap investigation. *Scott v. United States,* 436 U.S. 128, 136–143, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Efforts to minimize nonrelevant conversations must be "objectively rea-

---

6. An identical "minimization" requirement appears in 18 USCS § 2518(5).

sonable" in light of the circumstances confronting the interceptor. See *Scott*, 436 U.S. at 137–40, 98 S.Ct. 1717.

In *United States v. McKinnon*, 721 F.2d 19 (1st Cir.1983), the United States Court of Appeals for the First Circuit rejected the contention that the appellant was entitled to suppression of intercepted conversations relating to federal firearms offenses because the Massachusetts law enforcement officers who intercepted those conversations were executing a state court-issued wiretap order that authorized the interception of only conversations relating to drug offenses. In its analysis of the "minimization" requirements found in 18 U.S.C. 2518(5), the *McKinnon* Court held:

> We do not believe that evidence relating to crimes other than those specified in a wiretap warrant must be discovered "inadvertently" or take officers by "surprise" in order for a court properly to authorize the use of such evidence pursuant to section 2517(5). Congress intended that evidence relating to unauthorized offenses should be given retroactive judicial approval under section 2517(5) if the "original [wiretap warrant] was lawfully obtained, ... was sought in *good faith and not as a subterfuge search*, and that the communication was in fact *incidentally* intercepted during the course of a lawfully executed order. (Emphasis supplied). . . .
>
> ... While an interception that is unanticipated is a *fortiori* incidental, the converse is not true: something does not have to be unanticipated in order to be incidental. Evidence of crimes other than those authorized in a wiretap warrant are intercepted "incidentally" when they are the by-product of a bona fide investigation of crimes specified in a valid warrant. Congress did not intend that a suspect be insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio.

721 F.2d at 22–23. Our interpretation of the applicable Maryland law is entirely consistent with the *McKinnon* Court's

interpretation of the parallel federal statute. The State was not required to amend the wiretap order as a condition precedent to monitoring appellant's February 7th phone calls.

An evaluation of reasonableness "must be ascertained from the facts and circumstances of each particular case." *Spease,* 275 Md. at 99, 338 A.2d 284.[7] Judge Turnbull was not clearly erroneous in finding that substantial compliance with the minimization requirements was achieved in this case.[8] After the January 14, 2000 conversation indicating that "Fats" had participated in the Virginia "smash and grab" robbery, the monitoring officers informed the supervising judge that they had intercepted a communication regarding an unspecified offense. Thereafter, but prior to February 7, 2000, the monitoring officers presented the supervising judge with logs and reports of ensuing conversations between "Fats" and Walton. Furthermore, on February 7th, after learning about the robbery and murder of Sergeant Prothero, the monitoring officer immediately contacted the supervising judge. Under these circumstances, we agree with Judge Turnbull that appellant was not entitled to suppression of the fruits of the Walton wiretap. *See Scott v. United States, supra,* 436 U.S. at 135, 98 S.Ct. 1717.

## II.

Appellant also challenges the denial of his motion to suppress his inculpatory statements to police. Appellant invoked his right to counsel more than once while in a holding

---

**7.** *See also United States v. Bankston,* 182 F.3d 296, 307 (5th Cir.1999); *United States v. Hyde,* 574 F.2d 856, 869 (5th Cir.1978)(explaining that the minimization standard applies a test of reasonableness to the particular facts of each case); *United States v. Armocida,* 515 F.2d 29, 42 (3rd Cir.1975)(stating that the minimization standard is one of the reasonableness of a particular interception, which is to be ascertained on a case-by-case analysis).

**8.** The State conceded that one call (that lasted 5 minutes and 27 seconds) had not been "spot monitored," and asked Judge Turnbull to "throw that call out." Appellant's whereabouts, however, was discovered as a result of a twenty second call that he placed from 1013 North Ellamont Street.

cell, before detectives arrived to interview him. Detective Phillip Marll testified that he therefore consulted with Assistant State's Attorney Ann Brobst, who agreed that there could be no interrogation because appellant's assertions of his right to counsel had been clear and unequivocal. The detective then prepared appellant's statement of charges and informed appellant that he was being charged with murder. At this point, appellant insisted that he had not killed anyone and that he wanted to tell the police what had happened. Although repeatedly advised that the officers could not talk with him because he had asserted his right to counsel, appellant declared that he understood his rights and that he wished to tell the police who killed the victim. Appellant was then advised of his *Miranda* rights [9] and signed a waiver, confirming that he wished to speak to the officers. Appellant gave an oral statement, admitting that he participated in the robbery, but insisting that he had not carried a gun and that Tony Moore was the shooter.

Appellant argues that the conduct of the police was designed to "spark" his statement, thereby rendering his waiver a nullity. See *Bryant v. State,* 49 Md.App. 272, 431 A.2d 714, *cert. denied,* 291 Md. 782 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982), and *Wallace v. State,* 100 Md.App. 235, 640 A.2d 749 (1994). From our independent review of the record, we hold that appellant's statement was admissible. [10]

---

**9.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**10.** In reviewing the denial of a motion for suppression, this Court looks only to the facts developed at the hearing. The appellate court extends great deference to the factual findings of the suppression hearing judge, and accepts all first-level factual findings that are not clearly erroneous. The appellate court then makes its own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *See Ferris v. State,* 355 Md. 356, 368–69, 735 A.2d 491 (1999); *Marr v. State,* 134 Md.App. 152, 163, 759 A.2d 327 (2000), *cert. denied,* 362 Md. 623, 766 A.2d 147 (2001).

■ "It is established law that once a defendant, 'detained in a custodial setting, has asserted his right to counsel, all interrogation must cease until an attorney has been furnished to consult with him or he initiates further communication, exchange or conversations.' " *Williams v. State,* 342 Md. 724, 760, 679 A.2d 1106 (1996)(quoting *State v. Conover,* 312 Md. 33, 38, 537 A.2d 1167 (1988), in turn citing, *inter alia, Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). Appellant argues that the conduct of the police in this case constituted an "interrogation." We are persuaded, however, that the police officers' conduct was not the functional equivalent of an interrogation.

■ For purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Williams,* 342 Md. at 760, 679 A.2d 1106 (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)(footnote omitted in *Williams* )); *accord Argueta v. State,* 136 Md.App. 273, 283–89, 764 A.2d 863 (2001).

In *Rhode Island v. Innis, supra,* the defendant, who had been arrested for a robbery committed with a shotgun, was being transported to the police station. During the drive, the officers expressed their concern about the safety of handicapped children should one of them find the gun used in the robbery. Overhearing those comments, Innis led the police to a nearby field, where the shotgun was found under some rocks by the side of the road. 446 U.S. at 293–304, 100 S.Ct. 1682. The Supreme Court held that the officers' conversation about the children's safety was not the functional equivalent of interrogation. The *Innis* Court observed that the entire conversation "consisted of not more than a few offhand remarks" rather than "a lengthy harangue in the presence of the suspect," that there was nothing to suggest that the officers

were aware that Innis' conscience was peculiarly susceptible to an appeal concerning the safety of handicapped children, and that there was nothing in the record indicating that Innis was unusually disoriented or upset by his arrest. *Id.* at 302–03, 100 S.Ct. 1682.

Informing a suspect of the charges or evidence against him is simply not—of itself—the equivalent of interrogation. *See Williams,* 342 Md. at 760–61, 679 A.2d 1106 (comments which simply advised Williams that police had evidence, that they believed established his guilt in a double homicide, were not reasonably likely to elicit an incriminating response); *Vines v. State,* 285 Md. 369, 372–81, 402 A.2d 900 (1979)(displaying seized contraband and presenting copy of search warrant listing seized inventory did not constitute "interrogation").

In *Williams,* the Court of Appeals rejected the contention that certain words and actions of police officers were reasonably likely to elicit incriminating responses from a person who had asserted his right to counsel. Williams made one incriminating statement "as the police officers began to gather their papers and told [him] to remove his earring," and another statement after one of the officers commented that " '[t]his is going to work' " and reiterated that he was being charged with two murders. *Id.* at 761, 679 A.2d 1106. According to the Court of Appeals,

> [t]hese were routine procedures that the officers could hardly be expected to anticipate would prompt an incriminating statement. . . .
>
> These comments simply advised Williams that police had evidence they believed established Williams's guilt in a double homicide, and as a result he was being charged with murder. We cannot conclude that the trial judge erred in finding that these innocuous comments were not reasonably likely to elicit an incriminating responses from Williams.

*Id.*

We agree with Judge Turnbull that, by informing appellant that he was being charged with murder and by reading him

the statement of charges, Detective Marll did not engage in the functional equivalent of interrogation. Accordingly, we affirm the denial of appellant's motion to suppress his statement.

### III.

The State's case against appellant is a classic example of felony murder, when a victim is gunned down by one of the robbers to further the robbers' escape from the scene of the robbery. In his final claim of reversible error, appellant contends that Judge Turnbull erroneously refused to grant his requested instruction on felony murder.

The jurors received the following "felony murder" instruction:

The defendant is charged with the crime of first degree felony murder. In order to convict the Defendant of the first degree felony murder the State must prove that the Defendant committed or attempted to commit a robbery, that the Defendant or another participating in the crime killed Sergeant Bruce Prothero, and three, that the act resulting in the death of Sergeant Prothero occurred during the commission, attempted commission, or escape from the immediate scene of the robbery. It is not necessary for the State to prove the Defendant intended to kill the victim.

In order to prove murder in the first degree by means of the felony murder rule, there must be direct causal connection between the homicide and the felony. There must be something more than mere coincidence in time and place, otherwise the felony murder rule will not apply.

The Defendant may be guilty of first degree felony murder even if he did not actually commit the murder and even if he earnestly desired that it not happen. Further, the Defendant may be guilty of first degree felony murder even if he had completed his escape from the robbery if the killing of Sergeant Prothero occurred while another participating in the robbery was escaping from the immediate scene of the crime.

After the instructions, and prior to final argument, defense counsel noted the following exception:

Your Honor, I'm excepting to the Court's failure to give instruction number three in the requested instructions, which was that in order to apply the felony murder rule the jury must find the killing of Sergeant Prothero was in furtherance of or pursuant to a common goal for which the defendants combined and thus you have to find it was a common goal on behalf of all four defendants combined or as to Defendant Troy White or then you must find him not guilty of murder in the first degree.

When reviewing jury instructions, an appellate court must consider the instructions in their entirety. *See Conyers v. State,* 354 Md. 132, 172–73, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999). Maryland Rule 4–325(c) states:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

(Emphasis supplied). Maryland law "is clear that a requested instruction need not be given where other instructions "fairly cover" the subject matter of the requested instruction." *Gunning v. State,* 347 Md. 332, 348, 701 A.2d 374 (1997); *accord Watkins v. State,* 357 Md. 258, 273, 744 A.2d 1 (2000); *Marr,* 134 Md.App. at 180–87, 759 A.2d 327. The Court of Appeals has emphasized "that a trial judge is under no obligation to use the precise language suggested by counsel in submitting an instruction." *Gunning,* 347 Md. at 350, 701 A.2d 374; *accord Acquah v. State,* 113 Md.App. 29, 54, 686 A.2d 690 (1996); *Davis v. State,* 104 Md.App. 290, 293, 656 A.2d 326 (1995).

Appellant maintains "that the uncontroverted evidence presented in the instant case generated a 'Mumford' instruction."

*See Mumford v. State,* 19 Md.App. 640, 313 A.2d 563 (1974).[11] We disagree. In *Watkins v. State,* 357 Md. 258, 744 A.2d 1 (2000), the jury could have found that, in the course of a robbery, Watkins's co-defendant had killed not only the robbery victim, but also a third accomplice in order to eliminate the accomplice as a witness. *Id.* at 259, 744 A.2d 1. Watkins requested a " 'Mumford type instruction.' " *Id.* at 264, 744 A.2d 1. The trial court declined to propound a *Mumford* instruction,[12] but did instruct the jury that " 'when two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts *done in furtherance of the commission of the offense* or the escape therefrom for each offense committed.' " *Id.* at 265, 744 A.2d 1 (emphasis added in *Watkins* ).

The Court of Appeals affirmed, stating:

> *Mumford* was a correct decision, on the facts presented in that case. When there is a legitimate dispute over whether the killing was sufficiently in furtherance of the common enterprise to be chargeable to each of the co-felons, and issue of fact is presented for the jury, under proper instructions, to resolve. The question of when such legitimate dispute is presented, however, requires some further analysis.

---

11. Jannavieve Mumford, with four male companions, broke into a farmhouse "searching for 'things to steal and rob.' " 19 Md.App. at 642, 313 A.2d 563. Two of her companions went into a nearby barn/garage. Unfortunately when the victim arrived home, the two companions raped and killed her in the garage. *Id.* Because there was evidence from which "the jury could have chosen not to believe that death occurred pursuant to the burglary, but rather from rape, fresh and independent of the common design," *Id.* at 644, 313 A.2d 563, and because this issue had not been fairly presented to the jury in the trial court's instructions, this Court reversed Mumford's felony murder conviction. *Id.*

12. The *Watkins* Court noted that "[h]e did not present to the court any particular instruction but apparently had in mind the kind of instruction that the Court of Special Appeals held should have been given in *Mumford* that, if the jury were to find that Watkins could not have anticipated that Jenkins would kill [the co-felon], it must acquit him of [that] murder." *Id.* at 264–65, 313 A.2d 563.

*Id.* at 266–67, 744 A.2d 1. In language similar to that contained in the instruction at issue, the *Watkins* Court explained that the felony murder doctrine makes "culpable other persons, who did not actually commit the homicide and who may, in fact, have earnestly desired that it not have happened." *Id.* at 267, 744 A.2d 1.

In *Watkins,* as in the case at bar, there was no evidence that would generate an issue of whether the killing of Sergeant Prothero was or was not in furtherance of the common enterprise. *Id.* at 271, 744 A.2d 1. Writing for the *Watkins* Court, Judge Wilner stated:

> [T]here must be some nexus between the killing and the underlying felony. Mere coincidence between the underlying felony and the killing is not enough; the conduct causing death must be in furtherance of the design to commit the felony.

*Id.* at 272, 744 A.2d 1.

The instruction in this case went even further than the instruction found to be adequate in *Watkins.* Judge Turnbull stated:

> In order to prove murder in the first degree by means of the felony murder rule, there must be direct causal connection between the homicide and the felony. There must be something more than mere coincidence in time and place, otherwise the felony murder rule will not apply.

There is no merit in the argument that appellant was entitled to an acquittal unless the jury found that the murder of Sergeant Prothero "was a common goal on behalf of all four defendants combined or as to Defendant Troy White." Appellant was not entitled to any instruction other than the one delivered by Judge Turnbull.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**